# EXHIBIT 1

NYSCEF DOC. NO. 1

INDEX NO. 650026/2018

RECEIVED NYSCEF: 02/06/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------ x
                                        :

GATE WORLDWIDE HOLDINGS LLC

                                      :   Index No.

                 Plaintiff,

                                      :   **COMPLAINT**

       -against-

                                        :

INTERTOUCH HOLDINGS LLC;
ST HOLDINGS LLC; INTERTOUCH TOPCO LLC;    :
AND NOMADIX, INC.

                                        :

                 Defendants.

                                        :

------------------------------------------------------------------ x

       Plaintiff, GATE WORLDWIDE HOLDINGS LLC ("Plaintiff"), by and through its attorneys, Robinson & Cole LLP, as and for its Complaint against Defendants, INTERTOUCH HOLDINGS LLC, ST HOLDINGS LLC, INTERTOUCH TOPCO LLC, and NOMADIX, INC. (collectively, "Defendants") alleges as follows:

## NATURE OF CASE

      1.     This action arises out of the default of interTouch Holdings LLC under a Note Purchase Agreement (the "NPA") by failing to repay Plaintiff upon the maturity date of the Promissory Note (the "Note"), and the default of ST Holdings LLC, interTouch Topco LLC, and Nomadix, Inc. under their individual guaranties of interTouch Holdings LLC's obligations. Following the defaults, Plaintiff and Defendants entered into a forbearance agreement, affirming that $48,050,000, plus interest was due and payable to Plaintiff, affirming that such amounts were not contested, and affirming that Defendants have no defenses, right of offset, credits or other claims or defenses to such amounts. The forbearance period ended on November 1, 2017.

NYSCEF DOC. NO. 1

INDEX NO. 650026/2018

RECEIVED NYSCEF: 02/06/2018

To date, however, Defendants remain in breach of their respective obligations to Plaintiff, all to the detriment of Plaintiff.

## PARTIES

2.     The Plaintiff, Gate Worldwide Holdings LLC was, and still is, a limited liability company organized under the laws of the State of Delaware.

3.     Upon information and belief, at all relevant times, Defendant, interTouch Holdings LLC ("interTouch"), was, and still is a limited liability company organized under the laws of the State of Delaware.

4.     Upon information and belief, at all relevant times, Defendant, ST Holdings LLC ("ST"), was, and still is a limited liability company organized under the laws of the State of Florida.

5.     Upon information and belief, at all relevant times, Defendant, interTouch Topco LLC ("Topco"), was, and still is a limited liability company organized under the laws of the State of Delaware.

6.     Upon information and belief, at all relevant times, Defendant, Nomadix, Inc. ("Nomadix"), was, and still is a limited liability company organized under the laws of the State of Delaware.

## JURISDICTION AND VENUE

7.     The Court has personal jurisdiction over Defendants because they consented to the jurisdiction of this Court in the contracts which are at issue in this litigation.

8.     Venue properly lies in this Court because Defendants agreed that any claims relating to the contracts which are at issue in this litigation be brought in the state and federal courts located in New York, New York.

2

NYSCEF DOC. NO. 1

INDEX NO. 650026/2018

RECEIVED NYSCEF: 02/06/2018

## BACKGROUND

### The Note Purchase Agreement and Promissory Note

9.      On or about September 29, 2015, interTouch and non-party NTT Docomo, Inc. ("Docomo") entered into the NPA, dated as of that date, to govern the Obligations (defined in the NPA as "all advances, debts, liabilities, obligations, covenants and duties arising under any Note Documents . . .") owing by interTouch to Docomo. A copy of the NPA is attached as **Exhibit A**. (The NPA, all amendments and modifications thereto, all promissory notes, collateral agreements, guarantees and other note documents and obligations are collectively referred to as the "Note Documents.")

10.      Pursuant to the NPA, interTouch agreed to issue to Docomo, and Docomo agreed to receive from interTouch, the Note, dated September 29, 2015, evidencing interTouch's unconditional and absolute obligations to repay Docomo. A copy of the Note is attached as **Exhibit B**.

11.      On or about September 29, 2015 and pursuant to the NPA, interTouch duly executed, acknowledged, delivered to Docomo the Note in the original principal amount of Fifty-Five Million Dollars ($55,000,000), by which interTouch agreed to repay pursuant to the terms of the Note and NPA.

12.      Pursuant to the Note, the principal amount, together with accrued and unpaid interest, were to be payable in two installments: the first in the amount of Five Million Dollars ($5,000,000) payable on October 9, 2015, and the remaining principal balance payable on March 31, 2017.

13.      Pursuant to Section 1.9 of the NPA, interest accrues on the unpaid principle at a rate of 6.00% per annum.

3

INDEX NO. 650026/2018
RECEIVED NYSCEF: 02/06/2018

14.    Pursuant to Section 1.9 of the NPA and Section 2.1 of the Note, upon an "Event of Default," the interest rate shall automatically and immediately change from 6.00% per annum to a rate of 8.00% per annum.

15.    The failure of interTouch to pay the amount due on the Note at its maturity – March 31, 2017 – is an Event of Default under the NPA.

16.    Pursuant to Section 10.2 of the NPA, the parties agreed that the NPA "shall inure to the benefit of, and be binding upon and enforceable by and against, the parties hereto and their respective successors, assigns, heirs, executors and administrators."

17.    Pursuant to Section 7.1 of the Note, the parties agreed that "[a]ll rights of [interTouch] and [Docomo] under this Note shall inure to the benefit of their respective successors, assigns, and legal representatives and this Note and all the provisions hereof shall be binding upon [interTouch] and [Docomo] and their respective successors, assigns, and legal representatives and all other persons or entities claiming under or through them."

**The ST Guaranty and Pledge**

18.    Pursuant to the NPA, on or about September 29, 2015, and as part of the consideration to Docomo to enter into the Note and NPA, ST executed a guaranty (the "ST Guaranty"). A copy of the ST Guaranty is attached as **Exhibit C**.

19.    The ST Guaranty inures to the benefit of and is enforceable by Docomo and its successors and assigns.

20.    Pursuant to the ST Guaranty, in the event interTouch fails or is unable to pay or perform its obligations under the Note, Docomo or its assigns may proceed directly against ST to obtain performance and to collect and recover the full amount, or any portion, of the obligations

4

INDEX NO. 650026/2018
RECEIVED NYSCEF: 02/06/2018

that are due and payable and ST shall pay or cause to be paid to Docomo or its assigns the full amount of the obligations.

21.    The ST Guaranty was secured by a Membership Interest Pledge, dated September 29, 2015 (the "ST Pledge"). A copy of the ST Pledge is attached as **Exhibit D**.

22.    The ST Pledge inures to the benefit of Docomo and its successors and assigns.

23.    Pursuant to Section 2 of the ST Pledge, ST granted to Docomo "a first priority ... security interest in all of [ST's] right, title and interest in and to the Collateral, as collateral security for the prompt and complete payment and performance when due ... of the [o]bligations [defined in the ST Guaranty]."

24.    The portion of collateral secured by the ST Pledge is defined as "the membership interest units of [Topco] owned by [ST], as such amount may be adjusted from time to time by [Topco], pursuant to splits, together with all certificates, options, or rights of any nature whatsoever that may be issued or granted in such membership interest units by [Topco] to [ST] while this Agreement is in effect" (the "ST Collateral").

25.    Pursuant to Section 6 of the ST Pledge, upon the "Event of Default" Docomo has the right to receive any and all cash dividends paid in respect of the ST Collateral and all membership interest units comprising the ST Collateral shall be registered in the name of the secured party.

26.    Pursuant to Section 7 of the ST Pledge, upon the "Event of Default" Docomo may exercise all rights and remedies of a secured party under the UCC and may collect, receive, appropriate, and realize upon the collateral.

27.    On or about September 30, 2015, Docomo perfected its security interest in the membership interest units of interTouch owned by ST by filing with the Florida Secretary of

5

INDEX NO. 650026/2018

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 02/06/2018

State a UCC-1 financing statement. A copy of the ST UCC-1 Financing Statement is attached as **Exhibit E**.

**The Topco Guaranty and Pledge**

28.     Pursuant to the NPA, on or about September 29, 2015, and as part of the consideration to Docomo to enter into the Note and NPA, Topco executed a guaranty (the "Topco Guaranty"). A copy of the Topco Guaranty is attached as **Exhibit F**.

29.     The Topco Guaranty inures to the benefit of and is enforceable by Docomo and its successors and assigns.

30.     Pursuant to the Topco Guaranty, in the event interTouch fails or is unable to pay or perform its obligations under the Note, Docomo or its assigns may proceed directly against Topco to obtain performance and to collect and recover the full amount, or any portion, of the obligations that are due and payable and Topco shall pay or cause to be paid to Docomo or its assigns the full amount of the obligations.

31.     The Topco Guaranty was secured by a Membership Interest Pledge, dated September 29, 2015 (the "Topco Pledge"). A copy of the Topco Pledge is attached as **Exhibit G**.

32.     The Topco Pledge inures to the benefit of Docomo and its successors and assigns.

33.     Pursuant to Section 2 of the Topco Pledge, Topco granted to Docomo "a first priority ... security interest in all of [Topco's] right, title and interest in and to the Collateral, as collateral security for the prompt and complete payment and performance when due ... of the [o]bligations [defined in the Topco Guaranty]."

34.     The portion of collateral secured by the Topco Pledge is defined as "the membership interest units of [interTouch] owned by [Topco], as such amount may be adjusted

6

INDEX NO. 650026/2018

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 02/06/2018

from time to time by [interTouch], pursuant to splits, together with all certificates, options, or rights of any nature whatsoever that may be issued or granted in such membership interest units by [interTouch] to [Topco] while this Agreement is in effect" (the "Topco Collateral").

35.    Pursuant to Section 6 of the Topco Pledge, upon the "Event of Default" Docomo has the right to receive any and all cash dividends paid in respect of the Topco Collateral and all membership interest units comprising the Topco Collateral shall be registered in the name of the secured party.

36.    Pursuant to Section 7 of the Topco Pledge, upon the "Event of Default" Docomo may exercise all rights and remedies of a secured party under the UCC and may collect, receive, appropriate, and realize upon the collateral.

37.    On or about September 30, 2015, Docomo perfected its security interest in the membership interest units of interTouch owned by Topco by filing with the Delaware Secretary of State a UCC-1 financing statement.  A copy of the Topco UCC-1 Financing Statement is attached as **Exhibit H**.

**The Nomadix Guaranty and Patent Security Agreement**

38.    Pursuant to the NPA, on or about September 29, 2015, and as part of the consideration to Docomo to enter into the Note and NPA, Nomadix executed a guaranty (the "Nomadix Guaranty").  A copy of the Nomadix Guaranty is attached as **Exhibit I**.

39.    The Nomadix Guaranty inures to the benefit of and is enforceable by Docomo and its successors and assigns.

40.    Pursuant to Section 2 of the Nomadix Guaranty, in the event interTouch fails or is unable to pay or perform its obligations under the Note, Docomo or its assigns may proceed directly against Nomadix to obtain performance and to collect and recover the full amount, or

7

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

any portion, of the obligations that are due and payable and Nomadix shall pay or cause to be paid to Docomo or its assigns the full amount of the obligations.

41.    The Nomadix Guaranty was secured by a Patent Security Agreement, dated September 29, 2015 (the "Patent Security Agreement").    A copy of the Patent Security Agreement is attached as **Exhibit J**.

42.    Pursuant to Section 1 of the Patent Security Agreement, Nomadix granted to Docomo "a security interest in and to all of its right, title and interest in and to the collateral . . . in order to secure the payment of all [o]bligations (as defined in the [Nomadix] Guaranty) and the performance of all the obligations related thereto."

43.    Collateral is defined in Section 2 of the Nomadix Pledge as follows:

> (a) all patents and patent applications owned by [Nomadix] including, without limitation, the patents and patent applications listed on Schedule A attached hereto and made a part hereof, together with all reissues, divisions, continuations, renewals, reexaminations, extensions and continuations-in-part of any of the foregoing (the "Patents"); (b) the inventions claimed in the Patents; (c) all income, royalties, damages and payments now and hereafter due or payable with respect to any of the Patents, including, without limitation, payments under all licenses entered into with respect to the Patents and damages and payments for past or future infringements of the Patents; and (d) the right to sue for past, present and future infringements of the Patents . . . (the "Nomadix Collateral").

44.    Pursuant to Section 11 of the Patent Security Agreement, upon the "Event of Default," Nomadix agrees to execute and deliver an assignment of all right, title, and interest in and to the "Patents" to Docomo and Docomo has the right to sell the Patents at a public or private sale.

45.    Pursuant to Section 11 of the Patent Security Agreement, upon an "Event of Default," Docomo and its assigns may exercise all rights and remedies of a secured party under the UCC.

8

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

46.    On or about September 30, 2015, Docomo perfected its security interest in the Patents by filing with the Delaware Secretary of State a UCC-1 financing statement. A copy of the Nomadix Financing Statement is attached as **Exhibit K**.

**The Purchase Agreement**

47.    On or about August 30, 2017, Docomo and Plaintiff entered into a purchase agreement (the "Purchase Agreement").

48.    Pursuant to the Purchase Agreement, Plaintiff agreed to purchase from Docomo, and Docomo agreed to sell to Plaintiff "the Note, with all rights, obligations and indebtedness evidence thereby (including, without limitation, all accrued and unpaid interest and fees as of the date hereof), as well as all of the rights, obligations, guaranties, pledges and perfected security interest evidence in the Note Documents."

49.    As an additional condition of the Purchase Agreement, Docomo assigned to Plaintiff, its successor and/or assigns all rights, title, and interests in, to and under all Note Documents.

50.    As a result of the Purchase Agreement and assignment of Note Documents, Plaintiff is entitled to assert the rights of Docomo in the Note Documents.

**interTouch's Default**

51.    interTouch failed  to comply with the terms and provisions of the NPA and Note by failing to pay all outstanding principal of the Note on the Maturity Date – March 31, 2017.

52.    As a result of this default and pursuant to the terms of the Note and NPA, the entire amount of the Note plus interest is due and payable by interTouch.

53.    As of the closing date of the Purchase Agreement, September 5, 2017, the aggregate amount of indebtedness owing under the Note is as follows:

9

NYSCEF DOC. NO. 1

INDEX NO. 650026/2018

RECEIVED NYSCEF: 02/06/2018

| | |
|---|---|
| Principal: | $ 48,050,000.00 |
| Unpaid interest: | $    725,607.73 |
| Total: | $ 48,775,607.73 |

54.    Pursuant to the Guaranties, the same amounts are owing by ST, Topco, and Nomadix.

55.    No part of the foregoing amounts has been paid by interTouch, ST, Topco, or Nomadix.

56.    As an additional result of this default, Docomo and/or its assigns have the right to collect, receive, appropriate, and realize upon the ST and/or Topco Pledged Stock, as well as the Nomadix Patents.

57.    ST, Topco, and/or Nomadix has not assigned, transferred, or otherwise permitted Plaintiff to take possession of the foregoing collateral.

58.    On September 8, 2017, Plaintiff declared the Note due and payable and provided notice to Defendants of its intent to exercise all rights and remedies pursuant to the Note Documents.

**The Forbearance Agreement**

59.    On October 6, 2017, Plaintiff and Defendants entered into a forbearance agreement (the "Forbearance Agreement"). A copy of the Forbearance Agreement is attached as **Exhibit L.**

60.    Pursuant to the Forbearance Agreement, Plaintiff agreed to forbear from enforcing its rights and remedies under the NPA and related documents until November 1, 2017, subject to certain representations, warranties, covenants, and acknowledgments by Defendants.

61.    These acknowledgements included, but were not limited to, the following:

10

NYSCEF DOC. NO. 1

INDEX NO. 650026/2018
RECEIVED NYSCEF: 02/06/2018

The Obligors [Defendants] confirm, acknowledge and agree that the current amounts owing under the Note Purchase Agreement and Other Note Documents is $48,050,000.00, plus interest, fees and all other amounts, and such amounts would be due under the Note Purchase Agreement and Other Note Documents absent the forbearance as provided in this Forbearance Agreement. *Obligors [Defendants] agree that the foregoing amounts would be due and payable from Obligors [Defendants], are not contested by Obligors [Defendants], and that there would be no defenses, right of offset, credits or other claims or defenses with respect to such foregoing amounts.* The Obligors further confirm that the Noteholder (including, for the avoidance of doubt, any predecessor thereof) has fully and timely performed all of its obligations and duties in compliance with the Note Purchase Agreement, the Other Note Documents and applicable law, and has acted reasonably, in good faith, and appropriately under the circumstances.

Forbearance Agreement, Section 2(d) (emphasis added).

62.     The forbearance period has ended.

63.     Notwithstanding, to date, Defendants have failed to comply with their obligations under the Note Documents.

### FIRST CAUSE OF ACTION
### (Breach of Contract Against Defendant interTouch Holdings LLC)

64.     Paragraphs 1 through 63 of this Complaint are incorporated herein by reference as if more fully set forth herein.

65.     interTouch entered into and agreed to the terms and conditions of the Note and the NPA with Docomo, and, therefore, is bound by their terms.

66.     The Note and the NPA are enforceable and impose upon interTouch contractual obligations.

67.     Docomo, and its assigns, including Plaintiff, fully performed their obligations to interTouch pursuant to the Note and the NPA.

68.     interTouch breached the terms and conditions of the Note and the NPA as a result of its failure to pay all outstanding principal of the Note on the maturity date, March 31, 2017.

11

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

69.    The Note and the NPA inure to the benefit of Docomo's assigns, including Plaintiff.

70.    As a direct result of interTouch's breaches of the Note and the NPA, Plaintiff has been damaged in the approximate sum of not less than $48,775,607.73, together with accrued interest.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against
### Defendants, ST Holdings LLC, interTouch Topco LLC, and Nomadix, Inc.)

71.    Paragraphs 1 through 70 of this Complaint are incorporated herein by reference as if more fully set forth herein.

72.    ST, Topco, and Nomadix entered into and agreed to the terms and conditions of ST Guaranty, Topco Guaranty, and Nomadix Guaranty with Docomo, and, therefore, are bound by their terms.

73.    The ST Guaranty, Topco Guaranty, and Nomadix Guaranty are enforceable and impose on ST, Topco, and Nomadix contractual obligations.

74.    Docomo, and its assigns, including Plaintiff, fully performed their obligations under the Guaranties.

75.    ST, Topco, and Nomadix breached each of their respective Guaranties by refusing, failing, or neglecting to pay the sums due from them to Plaintiff under the terms of the Guaranties.

76.    The Guaranties inure to the benefit of Docomo's assigns, including Plaintiff.

77.    As a direct result of ST, Topco and Nomadix's breaches of the Guaranties, Plaintiff has been damaged in the approximate sum of not less than $48,775,607.73, together with accrued interest.

12

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

## THIRD CAUSE OF ACTION
### (Breach of Contract Against
### Defendants ST Holdings LLC, interTouch Topco LLC, and Nomadix, Inc.)

78.    Paragraphs 1 through 77 of this Complaint are incorporated herein by reference as if more fully set forth herein.

79.    ST, Topco, and Nomadix entered into and agreed to the terms and conditions of ST Pledge, Topco Pledge, and Nomadix Patent Security Agreement, and, therefore, are bound by their terms.

80.    The ST Pledge, Topco Pledge, and Nomadix Patent Security Agreement are enforceable and impose on ST, Topco, and Nomadix contractual obligations.

81.    Upon information and belief, Docomo, and its assigns, including Plaintiff, fully performed their obligations under the Guaranties.

82.    Pursuant to the terms of the ST Pledge, the Topco Pledge, and the Nomadix Patent Security Agreement and the Uniform Commercial Code, Plaintiff is entitled to take possession of its collateral.

83.    By its conduct, ST, Topco, and Nomadix have prevented Plaintiff from exercising its right to take possession of the collateral.

84.    As a result, ST, Topco, and Nomadix are in breach of their obligations under the ST Pledge, Topco Pledge, and Nomadix Patent Security Agreement.

85.    Accordingly, Plaintiff is entitled to a judgment, ordering ST, Topco, and Nomadix to transfer possession of the collateral currently in the possession, custody or control to Plaintiff pursuant to the terms of the ST and Topco Pledge and the Nomadix Patent Security Agreement, or in the alternative, damages in an amount equal to the value of the collateral, together with

13

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

damages for ST, Topco, and Nomadix's wrongful detention of the collateral, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Foreclosure Against Defendant ST Holdings LLC)

86.    Paragraphs 1 through 85 of this Complaint are incorporated herein by reference as if more fully set forth herein.

87.    As is more fully described above, as a result of the Purchase Agreement and assignment of Note Documents by Docomo to Plaintiff, Plaintiff has a valid security interest in and to the ST Collateral and the proceeds of the ST Collateral pursuant to the Note Documents.

88.    Upon information and belief, Docomo, and its assigns, including Plaintiff, fully performed their obligations under the Loan Documents, including the ST Pledge.

89.    As a result of the interTouch's default, as described above, Plaintiff is entitled to foreclosure of its interests in and to the ST Collateral and proceeds covered by the Loan Documents pursuant to New York CLS UCC § 9-601, *et seq* and the applicable provisions of the Note Documents, and is entitled to have any and all sums due and owing by interTouch under the Note Documents paid in full from the proceeds of any sale of the ST Collateral.

## FIFTH CAUSE OF ACTION
### (Foreclosure Against Defendant interTouch Topco LLC)

90.    Paragraphs 1 through 89 of this Complaint are incorporated herein by reference as if more fully set forth herein.

91.    As is more fully described above, as a result of the Purchase Agreement and assignment of Note Documents by Docomo to Plaintiff, Plaintiff has a valid security interest in and to the Topco Collateral and the proceeds of the Topco Collateral pursuant to the Note Documents.

14

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 02/06/2018

92.    Upon information and belief, Docomo, and its assigns, including Plaintiff, fully performed their obligations under the Loan Documents, including the Topco Pledge.

93.    As a result of the interTouch's default, as described above, Plaintiff is entitled to foreclosure of its interests in and to the Topco Collateral and proceeds covered by the Loan Documents pursuant to New York CLS UCC § 9-601, *et seq* and the applicable provisions of the Note Documents, and is entitled to have any and all sums due and owing by interTouch under the Note Documents paid in full from the proceeds of any sale of the Topco Collateral.

## SIXTH CAUSE OF ACTION
### (Foreclosure Against Defendant Nomadix, Inc.)

94.    Paragraphs 1 through 93 of this Complaint are incorporated herein by reference as if more fully set forth herein.

95.    As is more fully described above, as a result of the Purchase Agreement and assignment of Note Documents by Docomo to Plaintiff, Plaintiff has a valid security interest in and to the Nomadix Collateral and the proceeds of the Topco Collateral pursuant to the Note Documents.

96.    Upon information and belief, Docomo, and its assigns, including Plaintiff, fully performed their obligations under the Loan Documents, including the Nomadix Patent Security Agreement.

97.    As a result of the interTouch's default, as described above, Plaintiff is entitled to foreclosure of its interests in and to the Nomadix Collateral and proceeds covered by the Loan Documents pursuant to New York CLS UCC § 9-601, *et seq* and the applicable provisions of the Note Documents, and is entitled to have any and all sums due and owing by interTouch under the Note Documents paid in full from the proceeds of any sale of the Topco Collateral.

15

INDEX NO. 650026/2018
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 02/06/2018

**WHEREFORE,** the Plaintiff demands judgment against Defendants as follows:

1.    Money damages in the sum of not less than $48,775,607.73;
2.    Late charges and interest;
3.    Costs;
4.    Attorneys' fees;
5.    Disbursements;
6.    Specific performance;
7.    Judgment ordering such security interests created by the Loan Documents foreclosed, awarding Plaintiff possession of all Collateral, and ordering the Collateral and proceeds subject thereto be sold, on the terms approved by the Court upon application by Plaintiff after judgment is rendered, and that the proceeds of the sale be applied towards the satisfaction and payment of the expenses of sale, the costs of this action, Plaintiff's judgment; and
8.    Such other or further relief as this Court deems just and equitable.

Dated: New York, New York
       January 3, 2018

                              PLAINTIFF,
                              GATE WORLDWIDE HOLDINGS LLC

                              By____*/s/ Joseph L. Clasen*_____
                                   Joseph L. Clasen
                                   Ian T. Clarke-Fisher
                                   Trevor L. Bradley
                                   Robinson & Cole LLP
                                   666 Third Avenue
                                   New York, New York 10017
                                   Phone:  (212) 451-2900
                                   E-mail: jclasen@rc.com
                                   E-mail: iclarke-fisher@rc.com
                                   E-mail: tbradley@rc.com
                                   Its Attorneys

16

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

EXECUTION VERSION

# NOTE PURCHASE AGREEMENT

by

**INTERTOUCH HOLDINGS LLC**,
as Issuer,

in favor of

**NTT DOCOMO, INC.**,
as Noteholder,

dated as of

September 29, 2015

WEIL:\95477710\14\41340.0008
35791134.v12

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2
INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

# NOTE PURCHASE AGREEMENT

This Note Purchase Agreement ("Agreement") is made as of September 29, 2015 by and between INTERTOUCH HOLDINGS LLC, a company incorporated under the laws of Delaware (the "Issuer") and NTT DOCOMO, INC., a company incorporated under the laws of Japan (the "Seller" and, in its capacity as holder of the Note (as defined below), the "Noteholder").

In consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1

## PURCHASE OF NOTE; SECURITY DOCUMENTS

### 1.1.  PURCHASE OF NOTE

On the terms and subject to the conditions of this Agreement, the Issuer agrees to issue to Noteholder, and the Noteholder agrees to receive from Issuer, the Note in consideration for a portion of the purchase price under, and in accordance with, the terms of, the Share Sale Agreement.

### 1.2.  NOTE

The Issuer's unconditional and absolute obligation to repay the Noteholder shall be evidenced by a promissory note (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and together with any renewals thereof or substitutions therefor, the "Note"), in the form of Exhibit A hereto, with appropriate insertions, dated the Closing Date. The date and amount of each repayment and prepayment of principal thereon received by the Noteholder shall be recorded by the Noteholder in its records or, at its option, on the schedule attached to the Note. The aggregate unpaid principal amount so recorded shall be prima facie evidence of the principal amount owing and unpaid on the Note to the Noteholder absent manifest error. The failure to so record any such amount or any error in so recording any such amount, however, shall not limit or otherwise affect the Issuer's obligations hereunder or under the Note to repay the principal amount of the Note together with all interest accruing thereon.

### 1.3.  CLOSING

The closing (the "Closing") at which the Issuer shall sell, and the Noteholder shall purchase, the Note will take place in Tokyo, Japan at 5:00 p.m. (Tokyo Time) at the offices of the Noteholder upon the satisfaction of the conditions to Closing set forth in this Agreement on the date hereof, or such other place, time and date as shall be mutually agreed to by the Issuer and the Noteholder.

-2-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 01/03/2018

### 1.4.   USE OF PROCEEDS

The issuance of the Note on the Closing Date shall constitute payment of a like portion of the purchase price required to be paid by Issuer, as Purchaser, pursuant to the Share Sale Agreement. It is expressly understood and agreed that issuance of the Note is not in respect of the purchase or carry of any "margin stock" (as defined in Regulation U promulgated by the Board of Governors of the Federal Reserve System).

### 1.5.   ISSUER SECURITY DOCUMENTS.

All of the obligations of the Issuer under the Note shall be secured by the Collateral upon and subject to the terms of the Security Agreements and the other Note Documents.

Within sixty (60) days of the Closing Date, EI shall pay or cause to be paid all Existing EI Loans (such date, the "Conversion Date"), Issuer shall cause ST Holdings to execute the pledge of 65% of the common stock shares in Exceptional Innovation Coöperatief U.A., a cooperative formed under the laws of The Netherlands, in form and substance reasonably satisfactory to the Noteholder (the "ST Stock Pledge") (it being expressly understood and agreed that the ST Stock Pledge shall not contain representations, warranties, covenants or events of default more restrictive than those set forth in the pledge agreements included in the Security Agreements as of the date hereof), and the Noteholder agrees that certain Guaranty of even date herewith between ST Holdings and the Noteholder shall convert into a non-recourse guaranty with resort solely to the collateral specified in the ST Stock Pledge. The delivery of the ST Stock Pledge shall be accompanied by evidence of existence and authority of ST Holdings as may be reasonably requested by the Noteholder.

Not later than thirty (30) days following the Closing Date, Nomadix shall become a direct wholly owned subsidiary of Issuer (the "Nomadix Transfer Date") and, contemporaneously with such transfer, Issuer shall cause Nomadix to enter into a (i) Patent Security Agreement, in substantially the form of Exhibit B, and (ii) Guaranty by Nomadix, in substantially the form of Exhibit C.

### 1.6.   GUARANTIES; GUARANTORS SECURITY

All of the obligations of the Issuer under the Note and this Agreement shall be unconditionally guaranteed pursuant to the Guaranties and secured by the Security Agreements.

### REPAYMENT; PREPAYMENTS; INTEREST

### 1.7.   REPAYMENT OF THE NOTE

The Issuer shall repay the aggregate outstanding principal amount of the Note in two installments, the first in the amount of Five Million Dollars ($5,000,000.00) payable on October 9, 2015 (the "Installment Payment"), and the remaining principal balance on March 31, 2017 (the "Maturity Date"), or the date upon which the Note becomes or is declared due and payable pursuant to Article VI of this Agreement.

WEIL\96477748\04\49349.0008
3570114-v12

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM          INDEX NO. 650026/2018

NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 01/03/2018

### 1.8.    PREPAYMENTS

(a)    The Issuer shall have the right to prepay the principal amount of the Note, in whole or in part, at any time and from time to time without penalty or premium. Any prepayment of principal shall be accompanied by a payment of all interest accrued and unpaid on the portion of the principal amount being prepaid.

(b)    The Issuer shall be obligated to prepay the principal amount of the Note to the extent of the Net Cash Proceeds received in connection with the occurrence of any one or more of the following events within fifteen (15) Business Days following receipt of such Net Cash Proceeds:

(i)    licensing of the Nomadix Patents, solely to the extent received following the Nomadix Transfer Date;

(ii)    any type of permitted sale or other disposition of Issuer's assets outside the ordinary course of business to the extent the Net Cash Proceeds thereof exceed $1 million in any fiscal year of Issuer (it being expressly understood and agreed that the first $1 million of such Net Cash Proceeds in each such fiscal year shall not be subject to mandatory prepayment pursuant to this clause (ii)); and

(iii)    any type of Indebtedness incurred, or equity issued, by Issuer, except for (x) equity issued pursuant to Equity Cures and (y) incurrences of Indebtedness permitted by Section 5.3.

### 1.9.    INTEREST

(a)    The Note shall bear interest at a rate of 6.00% per annum. All accrued interest on the Note shall be payable in arrears on the last day of each quarter, with the first quarterly payment due on December 31, 2015, and thereafter on each of March 31, June 30 and September 30, and December 31 through and including the Maturity Date; provided that (i) interest accrued pursuant to Section 1.9(b) shall be payable on demand, and (ii) in the event of any repayment or prepayment of the Note, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. All computations of interest shall be made on the basis of a year of 365/366 days, and actual days elapsed.

(b)    Notwithstanding the rate of interest specified above, after an Event of Default and during the continuance thereof (regardless of whether the Note have been accelerated), the Issuer agrees to pay interest (after as well as before judgment to the extent permitted by applicable law) on all unpaid principal, interest or other amounts owing under the Note Documents, regardless of whether such principal and other amounts are supported by cash collateral, at a rate of 8.00% per annum.  Unpaid interest on such amounts will continue to accrue and will (to the extent permitted by applicable law) be compounded daily.

-4-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

### 1.10.  USURY

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Note, together with all fees, charges and other amounts which are treated as interest on the Note under applicable law shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Noteholder in accordance with applicable law, the rate of interest payable in respect of such Note hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate.

### 1.11.  DATE FOR PAYMENTS

Any payment under any Note Document falling due on a day that is not a Business Day shall be required to be made on the next succeeding Business Day.

<div align="center">

## ARTICLE II

## CONDITIONS TO CLOSING

</div>

The obligation of the Noteholder to purchase the Note at the Closing is subject to the fulfillment to the Noteholder's satisfaction on or prior to the Closing Date of each of the following conditions, unless otherwise waived by the Noteholder.

### 2.1.  REPRESENTATIONS AND WARRANTIES CORRECT; NO DEFAULT OR MATERIAL ADVERSE EFFECT

The representations and warranties of the Issuer set forth in Article III hereof shall be true and correct when made, and shall be true and correct on the Closing Date with the same force and effect as if they had been made on and as of the Closing Date. No Event of Default, or any other event which, with the giving of notice, the lapse of time, or both, would constitute an Event of Default, shall have occurred and be continuing on the date of this Agreement or on the Closing Date. Since September 21, 2015, there shall not have been a material adverse change in the properties, business, operations, prospects, or condition (financial or otherwise) of the Issuer and the Guarantors, and no event shall have occurred or condition arisen, either individually or in the aggregate, that has had a Material Adverse Effect.

### 2.2.  PERFORMANCE

All covenants, agreements and conditions contained in this Agreement to be performed or complied with by the Issuer on or prior to the Closing Date shall have been performed or complied with by the Issuer.

### 2.3.  NO IMPEDIMENTS

None of the Issuer, the Guarantors, or the Noteholder shall be subject to any order, decree or injunction of a court or administrative or governmental body or agency of competent jurisdiction directing that the transactions provided for in the Note Documents or any material aspect thereof not be consummated as contemplated by the Note Documents. There shall not be

<div align="center">-5-</div>

WEIL:96477718\64\44049.0008
3579131-x121

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 01/03/2018

any action, suit, proceeding, complaint, charge, hearing, inquiry or investigation before or by any court or administrative or governmental body or agency pending or, to the Issuer's best knowledge, threatened, wherein an unfavorable order, decree or injunction would prevent the performance of any of the Note Documents or the consummation of any material aspect of the transactions or events contemplated thereby, declare unlawful any aspect of the transactions or events contemplated by the Note Documents, cause any material aspect of the transactions contemplated by the Note Documents to be rescinded or have a Material Adverse Effect.

## 2.4.    OTHER AGREEMENTS AND DOCUMENTS.

The Issuer shall have executed and delivered to the Noteholder this Agreement, issued to the Noteholder its Note, and the Issuer and each of the Guarantors, as applicable, shall have executed and delivered the following agreements and documents:

(a)    the Security Agreements;

(b)    the Guaranties;

(c)    a member's certificate of Issuer, (i) attaching a certified copy of the Certificate of Formation and current operating agreement of the Issuer and certifying the same as not having been amended and as being in being in full force and effect, (ii) attaching and certifying resolutions by the sole member of Issuer approving the execution, delivery and performance of the Note Documents to which Issuer is a party and the transactions contemplated thereby, and (iii) certifying as to the incumbency, and attaching specimen signatures of, the officers or other representatives of Issuer signing the Note Documents to which Issuer is a party;

(d)    a member's or secretary's certificate of each of the Guarantors, (i) attaching a certified copy of the relevant constitutive documents of each of the Guarantors and certifying the same as not having been amended and as being in being in full force and effect, (ii) attaching and certifying resolutions by the Board of Directors of each of the Guarantors approving the execution, delivery and performance of the Note Documents to which such Guarantor is a party and the transactions contemplated thereby, and (iii) certifying as to the incumbency, and attaching specimen signatures of, the officers or other representatives of each of the Guarantor signing the Note Documents to which such Guarantor is a party;

(e)    a Certificate of Good Standing (or equivalent) from the state of organization of the Issuer and each Guarantor;

(f)    UCC financing statements with respect to all Collateral requiring such a statement in order to perfect a security interest in such Collateral; and

(g)    original certificates for all outstanding certificated Capital Stock pledged

WEIL:\96477716\6\14348.0003
85/79134-v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM          INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 01/03/2018

pursuant to the Security Agreements accompanied by stock (or equivalent) powers executed in blank.

## 2.5.  CONSENTS

The Issuer shall have obtained all necessary consents or waivers, if any, from all parties governmental and private to any other material agreements to which the Issuer is a party or by which it is bound immediately prior to the Closing in order that the transactions contemplated by the Note Documents may be consummated.

## 2.6.  PROCEEDINGS AND OTHER DOCUMENTS

All organizational and other proceedings taken or required to be taken by the Issuer and any Guarantor in connection with the transactions contemplated by this Agreement and the other Note Documents to be consummated prior to the Closing shall have been taken, and the Noteholder shall have received such other documents, in form and substance reasonably satisfactory to the Noteholder and their counsel, as to such other matters incident to the transactions contemplated hereby as the Noteholder may reasonably request.

## 2.7.  [RESERVED].

## 2.8.  SHARE SALE AGREEMENT

In connection with the Share Sale Agreement Completion shall have occurred.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE ISSUER

As a material inducement to the Noteholder to enter into and perform its obligations under this Agreement, the Issuer hereby represents and warrants to the Noteholder as follows as of the date hereof:

## 3.1.  ORGANIZATION AND EXISTENCE

The Issuer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and, except as would not reasonably be expected to have a Material Adverse Effect, is qualified to do business in such other jurisdictions as the nature or conduct of its operations or the ownership of its properties require such qualification. The Issuer does not own or lease any property or engage in any activity in any jurisdiction that might require qualification to do business as a foreign corporation in such jurisdiction and where the failure to so qualify would reasonably be expected to have a Material Adverse Effect. The Issuer has furnished the Noteholder with true, correct and complete copies of its Certificate of Formation, operating agreement and all amendments thereto.

-7-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM        INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 01/03/2018

## 3.2.  SUBSIDIARIES

Excluding the Target and its Subsidiaries (which for the avoidance of doubt shall not be required to be listed on Schedule 3.2), the Issuer shall have the Subsidiaries listed on Schedule 3.2 hereto immediately after giving effect to the closing of the transactions contemplated by the Share Sale Agreement.

## 3.3.  AUTHORIZATION

(a)   The Issuer has all requisite organizational power and authority (i) to execute and deliver, and to perform and observe its obligations under, the Note Documents to which it is a respective party, and (ii) to consummate the transactions contemplated hereby and thereby, including, without limitation, the grant of any security interest.

(b)   All organizational action on the part of the Issuer necessary for the authorization, execution, delivery and performance by the Issuer of the Note Documents and the transactions contemplated therein, and for the authorization, issuance and delivery of the Note, has been taken.

## 3.4.  BINDING OBLIGATIONS; NO MATERIAL ADVERSE CONTRACTS

(a)   The Note Documents constitute valid and binding obligations of the Issuer and are enforceable in accordance with their respective terms, subject to the Legal Reservations.

(b)   The execution, delivery and performance by the Issuer of the Note Documents and compliance therewith will not result in any violation of and will not conflict with, or result in a breach of any of the terms of, or constitute a default, or accelerate or permit the acceleration of any rights or obligations under, any provision of state, local, federal or foreign law to which the Issuer is subject, the constituent documents of the Issuer, or any mortgage, indenture, agreement, instrument, judgment, decree, order, rule or regulation or other restriction to which the Issuer is a party or by which it is bound, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Issuer pursuant to any such term, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.

## 3.5.  COMPLIANCE WITH INSTRUMENTS

The Issuer is not (a) in violation of its organizational documents, (b) in default, and no event has occurred which, with the giving of notice, or the lapse of time, or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any material agreement, including, without limitation, any license, indenture or other instrument to which it is a party or by which it is bound or to which any of its property or assets is subject or (c) in violation of any law, ordinance, governmental rule,

-8-

WEIL:\96477718\6\44389.0003
3579194-12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

regulation or court decree to which it or its property may be subject, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.

## 3.6.  LITIGATION

There are no actions, suits or proceedings (including governmental or administrative proceedings), investigations, third-party subpoenas or inquiries by any regulatory agency, body or other governmental authority, to which the Issuer is a party or is subject, or to which any of their authorizations, consents and approvals or other properties or assets, is subject, which is pending, or, to the best knowledge of the Issuer, threatened or contemplated against the Issuer, or any of such property or assets, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect. The Issuer is not subject to any actions, suits or proceedings (including governmental or administrative proceedings), investigation, third-party subpoenas or inquiries by any regulatory agency, body or other governmental authority or any third Person regarding its accounting practices or policies.

## 3.7.  PERMITS; GOVERNMENTAL AND OTHER APPROVALS

(a)    The Issuer possesses all necessary consents, approvals, authorizations, orders, registrations, stamps, filings, qualifications, licenses, permits or other analogous acts by, of, from or with all public, regulatory or governmental agencies, bodies and authorities and all other third parties, to own, lease and operate its respective properties and to carry on its business as now conducted and proposed to be conducted, except, in each case, for those with respect to which the failure to possess or obtain would not reasonably be expected to have a Material Adverse Effect.  No approval, consent, authorization or other order of, and no designation, filing, registration, qualification or recording with, any governmental authority or any other Person is required in connection with the Issuer's valid execution, delivery and performance of this Agreement or the consummation of any other transaction contemplated on the part of the Issuer hereby, except for those with respect to which the failure to obtain or make would not reasonably be expected to have a Material Adverse Effect, and filings required to create or perfect security interests.

(b)    The Issuer is not, or upon consummation of the transactions contemplated under the Note Documents, will not be, subject to registration as an "investment company" under the 1940 Act.

## 3.8.  TAXES

The Issuer has (a) filed all necessary income, franchise and other material tax returns, domestic and foreign, (b) paid all taxes shown as due thereunder to the extent such taxes would be overdue if not so paid as of the date hereof and (c) withheld and paid to the appropriate tax authorities all amounts required to be withheld from wages, salaries and other remuneration to employees to the extent such payments are required to be made as of the date hereof, except, in the case of the foregoing (a), (b) and (c), to the extent the failure to making such filing,

withholding or payment would not reasonably be expect to have a Material Adverse Effect. The Issuer has no knowledge, nor has it received notice, of any tax deficiency which would reasonably be expected to be assessed against the Issuer which, if so assessed, would reasonably be expected to have a Material Adverse Effect.

### 3.9.    PERSONAL PROPERTY

The Issuer has valid title to each item of equipment, machinery, furniture, fixtures, vehicles, structures and other personal property, tangible and intangible, free and clear of any security interests, liens, charges or encumbrances whatsoever, except for Permitted Liens.

### 3.10.   RESERVED

### 3.11.   INSURANCE

The Issuer maintains, with financially sound and reputable insurers, insurance against loss or damage by theft, fire, explosion and other risks and liability to the extent and in the manner customary for companies in similar businesses in similar geographic locations or as may be required by applicable law.

### 3.12.   MATERIAL ADVERSE CHANGE

Since September 21, 2015, there has been no material adverse change in the properties, business, operations, prospects, or condition (financial or otherwise) of the Issuer.

### 3.13.   LABOR MATTERS

To the knowledge of Issuer, there are no strikes or other labor disputes or grievances or charges or complaints with respect to any employee or group of employees pending or threatened against the Issuer that would reasonably be expected to have a Material Adverse Effect. The Issuer is not party to any collective bargaining agreement or has any labor union been recognized as the representative of its employees.

### 3.14.   SOLVENCY

The Issuer, on a consolidated basis with its Subsidiaries, is Solvent.

### ARTICLE IV
### AFFIRMATIVE COVENANTS

The Issuer hereby covenants and agrees, until payment in full of the principal amount of the Note and all accrued and unpaid interest thereon (the "Note Discharge"), as follows (provided that for purposes of this Article IV, upon and following the Conversion Date references to Guarantors shall exclude ST Holdings):

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM

NYSCEF DOC. NO. 2

INDEX NO. 650026/2018

RECEIVED NYSCEF: 01/03/2018

## 4.1. MAINTENANCE OF CORPORATE EXISTENCE; PROPERTIES AND LEASES; TAXES; INSURANCE

(a)     The Issuer shall, and shall cause the Guarantors to, maintain in full force and effect its organizational existence and, except as would not reasonably be expected to have a Material Adverse Effect, rights and franchises.

(b)     The Issuer shall, and shall cause the Guarantors to, keep each of its properties necessary to the conduct of its business in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needful and proper repairs, renewals, replacements, additions and improvements thereto; and the Issuer shall, and shall cause the Guarantors to, at all times comply with each provision of all leases to which it is a party or under which it occupies property, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.

(c)     The Issuer shall, and shall cause the Guarantors to, (i) promptly pay and discharge, or cause to be paid and discharged when not overdue, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, assets, property or business of the Issuer and the Guarantors, (ii) withhold and pay before overdue, to the appropriate tax authorities, all amounts required under applicable law to be withheld from wages, salaries and other remuneration to employees, and (iii) pay all claims or indebtedness (including, without limitation, claims or demands of workmen, materialmen, vendors, suppliers, mechanics, carriers, warehousemen and landlords) which, if unpaid would reasonably be expected to become a lien upon the assets or property of the Issuer or the Guarantors; provided, however, that any such tax, lien, assessment, charge, levy, claim or indebtedness need not be withheld or paid if (1) the validity thereof shall be contested timely and in good faith by appropriate proceedings and the Issuer or the relevant Guarantor shall have set aside on its books adequate reserves with respect thereto or (2) the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(d)     [Reserved].

(e)     The Issuer shall, and shall cause the Guarantors to, keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by theft, fire, explosion and other risks customarily insured against by companies in the line of business of the Issuer or the relevant Guarantor, in amounts sufficient to prevent the Issuer or the relevant Guarantor from becoming a co-insurer of the property insured; and the Issuer shall, and shall cause the Guarantors to, maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to Persons and property to the extent and in the manner customary for companies in similar businesses similarly situated or as may be required by law, including, without limitation, general liability, fire and business interruption insurance, and product liability insurance as may be required pursuant to any license agreement to which the Issuer or the relevant Guarantor is a party or by which it is bound.

-11-

WEIL:\96547773\16\94249.0003
3579134v12

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018

NYSCEF DOC. NO. 2                                                    RECEIVED NYSCEF: 01/03/2018

## 4.2.    BASIC FINANCIAL INFORMATION

The Issuer shall furnish the following reports to the Noteholder, so long as Seller is a holder of the Note:

(a)    as soon as practicable, but in any event within 180 days after the end of each fiscal year of Topco or H, as the case may be, (i) audited consolidated balance sheets of each of Topco and H as at the end of such year, together with audited consolidated statements of income and cash flows of each of Topco and H for such year, together with notes related thereto, each prepared in the English language and in accordance with GAAP, consistently applied, and setting out in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and certified by certified independent public accountants of established national reputation, and (ii) projections for each of the reports specified in the preceding clause (i) for the following 12 month period

(b)    as soon as practicable, but in any event within 60 days after the end of each of the fiscal quarters of each of H, Topco and Nomadix in each year, an unaudited, internally-prepared consolidated balance sheet at the end of such quarter, and unaudited, internally-prepared consolidated statements of income and cash flows for such period and for the current fiscal year to date, in each case prepared in the English language in accordance with GAAP, consistently applied (subject to changes resulting from year-end audit adjustments and the absence of footnotes), together with description of material deviations from budget for such fiscal quarter; and

(c)    with reasonable promptness such other information and financial data concerning the Issuer, its consolidated Subsidiaries, or the Guarantors as the Noteholder entitled to receive materials under this Section 4.2 may reasonably request in writing (provided that information that would not be required to be disclosed pursuant to Section 4.6(b) shall not be required to be so provided).

## 4.3.    NOTICE OF ADVERSE CHANGE

The Issuer shall promptly give notice to the Noteholder (but in any event within five days) after a Responsible Officer becoming aware of the existence of any condition or event which constitutes, or the occurrence of, any of the following:

(a)    any Event of Default or any default that with the passage of time or the giving of notice would constitute an Event of Default;

(b)    the institution or threatening of institution of any action, suit or proceeding against the Issuer or any of its Subsidiary before any court, administrative agency or arbitrator, including, without limitation, any action of a foreign government or instrumentality, which would reasonably be expected to have a Material Adverse Effect; or

-12-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

(c)      any failure by the Issuer or any of its Subsidiaries to comply with the provisions of Section 4.4 below.

Any notice given under this Section 4.3 shall specify the nature and period of existence of the condition, event, information, development or circumstance, the anticipated effect thereof and what actions the Issuer or any Guarantor, as the case may be, has taken and proposes to take with respect thereto.

## 4.4.    COMPLIANCE WITH AGREEMENTS; COMPLIANCE WITH LAWS

The Issuer shall, and shall cause any of its Subsidiaries to, comply with the terms and conditions of all material agreements, commitments or instruments to which the Issuer or any of its Subsidiaries is a party or by which it or they may be bound, except to the extent such noncompliance would not reasonably be expected to have a Material Adverse Effect. The Issuer shall, and shall cause each of its Subsidiaries to, duly comply with any applicable Legal Requirements relating to the conduct of their respective businesses, properties or assets, except to the extent such noncompliance would not reasonably be expected to have a Material Adverse Effect.

## 4.5.    PROTECTION OF INTELLECTUAL PROPERTY

Except as would not reasonably be expected to have a Material Adverse Effect, the Issuer shall, and shall cause its Subsidiaries to, take commercially reasonably actions necessary to maintain, defend and protect its rights in all material trademarks, trade names, service marks, patents, patent applications and other material intellectual property owned by Issuer or such Subsidiary (including, without limitation, the Nomadix Patents) ("Material Intellectual Property") except to the extent Issuer or such Subsidiaries (as applicable) determines in good faith that any such Material Intellectual Property is no longer material or desirable in the conduct of its business.

## 4.6.    ACCOUNTS AND RECORDS; INSPECTIONS

(a)      The Issuer shall keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to the business and affairs of the Issuer and its Subsidiaries in accordance with GAAP applied on a consistent basis.

(b)      The Issuer shall permit the Noteholder (or representatives on behalf of the Noteholder) during regular business hours selected by the Issuer, upon reasonable advance notice, to visit the offices of the Issuer and its Subsidiaries to inspect the Collateral and to discuss the business affairs, finances and accounts of the Issuer with the Issuer's directors and officers; provided that notwithstanding the foregoing or any other provision hereof, neither the Issuer nor any of its Affiliates shall be required to disclose, permit the inspection, examination or making of copies of or discuss any document, information, or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of

-15-

WEIL:\98477710\16\41340.0003
3579134-12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

which disclosure to the Noteholder (or any of its representative) is prohibited by applicable Legal Requirements, (C) that is subject to attorney-client or similar privilege or constitutes attorney work product or (D) in respect of which a confidentiality obligation is owed to any third party (provided that in the case of this clause (D), Issuer shall use commercially reasonable efforts to obtain consent to disclose to the extent reasonably requested by the Noteholder).

(c)    Nothing contained in this Section 4.6 shall be construed to limit any rights that the Noteholder may have with respect to the books and records of the Issuer and its Subsidiaries to inspect its properties or to discuss its affairs, finances and accounts.

## 4.7.   MAINTENANCE OF OFFICE

The Issuer will maintain its principal office at the address of the Issuer set forth in Section 10.4 of this Agreement where notices, presentments and demands in respect of this Agreement and any of the Note may be made upon the Issuer, until such time as the Issuer shall notify the Noteholder in writing, at least 30 days prior thereto, of any change of location of such office.

## 4.8.   FURTHER ASSURANCES

From time to time the Issuer shall execute and deliver to the Noteholder such other instruments, certificates, agreements and documents and take such other action and do all other things as may be reasonably requested by the Noteholder in order to implement or effectuate the terms and provisions of this Agreement and the transactions contemplated hereby.

## 4.9.   COLLATERAL

With respect to all Collateral, the Issuer shall take all actions necessary to preserve and protect the Noteholder's first priority security interest therein, subject to Permitted Liens.

## ARTICLE V

## NEGATIVE COVENANTS

The Issuer hereby covenants and agrees, so long as the Note remains outstanding, it will not (and not allow any of the Guarantors (other than ST Holdings upon and following the Conversion Date) to), directly or indirectly, without the prior written consent of the Noteholder:

## 5.1.   STAY, EXTENSION AND USURY LAWS

At any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereinafter in force, which may affect the covenants or the performance of the Note or this Agreement, the

-14-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

Issuer hereby expressly waiving all benefit or advantage of any such law, or by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Noteholder but will suffer and permit the execution of every such power as though no such law had been enacted.

## 5.2.   LIENS

Create, incur, assume or permit to exist any mortgage, pledge, lien, security interest or encumbrance on any part of its properties or assets, or on any interest it may have therein, now owned or hereafter acquired, nor acquire or agree to acquire property or assets under any conditional sale agreement or title retention contract (the foregoing, collectively, "Liens"), except that the foregoing restrictions shall not apply to:

(a)    Liens for taxes, assessments and other governmental charges, which are (i) not then due, (ii) are being contested in good faith by appropriate proceedings and adequate reserves or other appropriate provisions, as shall be required by GAAP, have been made thereof or (iii) would not reasonably be expected to have a Material Adverse Effect;

(b)    Liens of workmen, materialmen, vendors, suppliers, mechanics, carriers, warehouseman and landlords or other like Liens, incurred in the ordinary course of business for sums not then due or that are being contested in good faith;

(c)    statutory Liens of landlords, statutory Liens of banks and rights of set-off, and other Liens imposed by law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that are being contested in good faith by appropriate proceedings, so long as reserves or other appropriate provisions, if any, as shall be required by GAAP, shall have been made for any such contested amounts;

(d)    liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, letters of credit, bank guaranties, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(e)    easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere with the ordinary conduct of the business of the Issuer or any of its Subsidiaries, except where such interference would not reasonably be expected to have a Material Adverse Effect;

(f)    any (i) interest or title of a lessor, sublessor, licensor or sublicensor under any lease or license, (ii) restriction or encumbrance that the interest or title of such lessor, sublessor, licensor or sublicensor may be subject to, or (iii) subordination of the interest of the lessee, sublessee, licensee or sublicensee under such lease or license to any restriction or encumbrance referred to in the preceding clause (ii), so long as the holder of such restriction or encumbrance

-15-

WEIL:\96427748\8\44849.0003
4579134.v1.2

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 01/03/2018

agrees to recognize the rights of such lessee, sublessee, licensee or sublicensee under such lease or license;

(g)    any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(h)    Liens securing capital lease and purchase money Indebtedness permitted pursuant to Section 5.3, provided that any such Lien shall encumber only the asset subject to such lease or acquired with the proceeds of such Indebtedness, and proceeds and products thereof, accessions thereto and improvements thereon;

(i)    (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks, (B) pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations, and (C) purchase orders and other agreements entered into with customers, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, and (iii) bankers Liens and rights and remedies as to deposit accounts;

(j)    (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of lis pendens and associated rights relating to litigation being contested in good faith not constituting an Event of Default and (ii) any pledge and/or deposit securing any settlement of litigation;

(k)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any Indebtedness;

(l)    Liens arising by operation of law under the UCC (and/or any similar requirement of law under any jurisdiction);

(m)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(n)    Liens existing on the Closing Date and renewals and replacements thereof; provided that no such Lien extends to any class of asset not covered by the Lien being so renewed or replaced;

(o)    Liens created under the Note Documents or any pledge or security agreement delivered in accordance with the terms thereof;

(p)    Liens under the Sale Purchase Agreement and any document or agreement entered into in connection therewith (if any); and

(q)    Liens on assets securing Indebtedness or other obligations in an aggregate amount at any time outstanding not to exceed $3 million.

## 5.3.    INDEBTEDNESS

-16-

WEIL:\96477718\6\14346.0003
3579134v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 01/03/2018

Create, incur, assume, suffer, permit to exist, or guarantee, directly or indirectly, any Indebtedness, excluding:

(a)    the endorsement of instruments for the purpose of deposit or collection in the ordinary course of business;

(b)    Indebtedness relating to obligations under guaranties in respect of Indebtedness otherwise permitted by this Section 5.3 or in the ordinary course of business of the obligations of suppliers, customers, and licensees of the Issuer, the Guarantors and their respective Subsidiaries;

(c)    accounts payable arising out of the purchase of merchandise or services in the ordinary course of business; or

(d)    Indebtedness outstanding under the Note Documents;

(e)    Indebtedness owing to the Issuer, any Guarantor or any of their respective Subsidiaries;

(f)    Indebtedness (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments in support any of the foregoing items;

(g)    Indebtedness in respect of banking services;

(h)    Indebtedness incurred in respect of obligations to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(i)    Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(j)    Indebtedness with respect to capital leases and purchase money Indebtedness in an aggregate outstanding principal amount not to exceed $1 million at any time outstanding;

(k)    Indebtedness under any interest rate or currency swap, derivative or hedging transaction not entered into for speculative purposes;

(l)    to the extent constituting Indebtedness, obligations arising under the Share Sale Agreement and the agreements entered into in connection therewith;

(m)    Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred in respect of workers compensation claims, unemployment insurance (including

-17-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018

RECEIVED NYSCEF: 01/03/2018

premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits;

(n)    [Reserved];

(o)    customer deposits and advance payments received from customers for goods and services;

(p)    Indebtedness existing on the Closing Date and refinancings and replacements thereof; and

(q)    other Indebtedness not otherwise permitted hereunder in an aggregate principal amount at any one time outstanding not to exceed $1 million.

## 5.4.  ARM'S LENGTH TRANSACTIONS

Enter into any transaction, contract or commitment or take any action other than at arm's length or as permitted under Section 5.6.

## 5.5.  NOTE AND ADVANCES

Directly or indirectly, make any advance or loan to, or guarantee any obligation of, any Person, except as permitted by Sections 5.3 or 5.7.

## 5.6.  TRANSACTIONS WITH AFFILIATES

(a)    Make any transfers of monies or other assets by way of dividend, distribution or redemption in respect of Capital Stock in any single transaction or series of transactions, except in connection with transactions otherwise permitted in this Agreement and except for:

(i)    those made to Issuer;

(ii)    those necessary to permit any direct or indirect parent entity to pay general and administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to any director, officer, employee, member of management, manager and/or consultant) and franchise taxes, and similar fees and expenses required to maintain the organizational existence of such parent entity, plus any indemnification or expense reimbursement claim made by any director, officer, member of management, manager, employee and/or consultant of any such parent entity, in each case, to the extent attributable to the ownership or operations of the Issuer or any Guarantor or their respective Subsidiaries;

(iii)    those necessary to permit any direct or indirect parent entity to discharge consolidated, combined, unitary or similar tax liabilities, to the extent such liabilities are attributable to the income of any of Issuer, the Guarantors and their respective Subsidiaries;

WEIL:\95477716\64\34940.0008
5579134-v/21

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM        INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 01/03/2018

(iv)    those necessary to permit any direct or indirect parent entity to pay audit and other accounting and reporting expenses and any insurance premiums, to the extent such expenses are attributable to any of Issuer, the Guarantors and their respective Subsidiaries; and

(v)    [Reserved].

(b)    Engage in any transaction with any of the officers, directors, employees or Affiliates of the Issuer or of its Subsidiaries, except:

(i)    on terms no less favorable to the Issuer, the Guarantors or their respective Subsidiaries as could be obtained at arm's length;

(ii)    those between or among Issuer, the Guarantors and their respective Subsidiaries;

(iii)    those in existence on the Closing Date any amendment, modification or extension thereof to the extent such amendment, modification or extension, taken as a whole, is not more disadvantageous to the Noteholder than the relevant transaction in existence on the Closing Date;

(iv)    any issuance, sale or grant of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of employment arrangements, stock options and stock ownership plans approved by the Board of Directors of any of Issuer, the Guarantors or their respective Subsidiaries;

(v)    transactions otherwise permitted by this Agreement;

(vi)    transactions permitted by Section 5.7; and

(vii)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the Board of Directors, officers, employees, members of management, managers, consultants and independent contractors of any of Issuer, the Guarantors and their respective Subsidiaries or any direct or indirect parent entity, in the ordinary course of business.

## 5.7.    INVESTMENTS

Make any advance or loan to, or guarantee any obligations of, or make other investments in, or purchase any stock, option, warrant, or other security or evidence of Indebtedness of, any Person (collectively, "Investments"), other than:

(a)    Investments in obligations of the United States and any state, agency, instrumentality or political subdivision thereof;

(b)    deposits, money market deposits, time deposit accounts, certificates of deposit or

-19-

WEIL:\95417773\18\94348.0003
3579134-12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 01/03/2018

other instruments maturing within one year from the date of purchase from financial institutions with capital in excess of $100 million;

(c)    commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's;

(d)    shares of any money market mutual fund that has a rating of at least A-2 from S&P or at least P-2 from Moody's;

(e)    Investments in Issuer, the Guarantors and their respective Subsidiaries;

(f)    Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of clause (iii), to the extent necessary to maintain the ordinary course of supplies to any of Issuer, the Guarantors or any of their respective Subsidiaries;

(g)    Investments (i) existing on, or contractually committed to or contemplated as of, the Closing Date and (ii) any modification, replacement, renewal or extension of any investment described in clause (i) above so long as no such modification, renewal or extension increases the amount of such investment except by the terms thereof or as otherwise permitted by this Section 5.7;

(h)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(i)    Investments consisting of (or resulting from) Liens permitted under Section 5.2, Indebtedness permitted under Section 5.3 and dividends, distributions and redemptions permitted by Section 5.6;

(j)    Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers;

(k)    (i) guarantees of leases (other than capital leases) or of other obligations not constituting Indebtedness and (ii) guarantees of the lease obligations of suppliers, customers, franchisees and licensees of any of Issuer, the Guarantors and their respective Subsidiaries, in each case, in the ordinary course of business;

(l)    Investments arising under or in connection with any swap, derivative or hedging transaction permitted under Section 5.3;

(m)    Investments consisting of the licensing of intellectual property rights pursuant to

-20-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

joint marketing arrangements with other persons entered into in the ordinary course of business;

(n)    Investments in connection with intercompany cash management arrangements and related activities in the ordinary course of business; and

(p)    additional Investments in an aggregate amount at any one time outstanding but to exceed $3 million.

### 5.8.    OTHER BUSINESS

Enter into or engage, directly or indirectly, in any business other than the business currently conducted or proposed to be conducted as disclosed to the Noteholder prior to the date hereof by the Issuer.

### 5.9.    RESERVED.

### 5.10.    CONSOLIDATIONS AND MERGERS

No Issuer shall, nor shall suffer or permit any Guarantor or any of Guarantors' Subsidiaries to, undergo a Change of Control.

### 5.11.    USE OF CASH

Use any of the cash held by Issuer before the Installment Payment is received by the Noteholder without the prior written consent of the Noteholder, which consent shall be given or withheld in the Noteholder's sole discretion, except (i) for business expenses occurring in the ordinary course when such expenses come due, and (ii) for the payment of the Installment Payment.

<div align="center">

**ARTICLE VI**
**EVENTS OF DEFAULT**

</div>

### 6.1.    EVENTS OF DEFAULT

If any of the following events shall occur and be continuing, an "Event of Default" shall be deemed to have occurred (provided that for purposes of this Article VI, upon and following the Conversion Date, references to Guarantors shall exclude ST Holdings):

(a)    If the Issuer shall default in the payment of (i) any part of the principal of the Note, when the same shall become due and payable, whether at maturity or at a date fixed for payment or prepayment or by acceleration or otherwise or (ii) any part of the interest of the Note, after a period of three (3) days of same becoming due and payable has lapsed, whether at maturity or at a date fixed for payment or prepayment or by acceleration or otherwise;

(b)    (i) if Issuer shall default in the performance of any of the covenants contained in

<div align="center">-21-</div>

WEIL:\96547\7\96964349.0003
3579124.v12.

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM   INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 01/03/2018

Article IV (other than Sections 4.2 and 4.3(a)) and such default shall continue for a period of thirty (30) days following the earlier of (x) knowledge of a Responsible Officer or (y) written notice of such default from the Noteholder to Issuer or (ii) if Issuer shall default in the performance of any of the covenants contained in Sections 4.2 or 4.3(a) or Article V;

(c)   if Issuer or any of the Guarantors shall default in the performance of any other agreement contained in any Note Documents and such default shall continue for a period of thirty (30) days following the earlier of (i) knowledge of a Responsible Officer or (ii) written notice of such default from the Noteholder to Issuer;

(d)   if any representation or warranty made by Issuer, any Guarantor or any of their officers in any Note Documents or in or any certificate delivered pursuant thereto shall prove to have been incorrect in any material respect when made;

(e)   If (i) any default shall occur under any indenture, mortgage, agreement or instrument evidencing, or under which there is at the time outstanding, any Indebtedness of the Issuer, any of the Guarantors, or any of Issuer's Subsidiaries in excess of $1 million and the effect of such default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice and/or lapse of time, if required, such Indebtedness to be declared to be due and payable prior to its stated maturity (any applicable grace period having expired) (other than a due on sale clause); or (ii) a Change of Control shall have occurred;

(f)   if any of the Issuer, the Guarantors, or Issuer's Subsidiaries shall default in the observance or performance of any term or provision of an agreement to which it is a party or by which it is bound which default would reasonably be expected to have a Material Adverse Effect and such default is not waived or cured within the applicable grace period;

(g)   if a final judgment which, either alone or together with other outstanding final judgments against the Issuer, a Guarantor, or any of Issuer's Subsidiaries exceeds an aggregate of $500,000 shall be rendered against the Issuer, such Guarantor, or such Subsidiary of Issuer, and such judgment shall have continued unpaid, undischarged or unstayed for 30 days after entry thereof;

(h)   Issuer, any of Issuer's direct or indirect subsidiaries or any Guarantor shall (i) file a petition in bankruptcy under any applicable bankruptcy, insolvency, reorganization, moratorium or other similar law of the United States of America or any state or political subdivision for the relief of debtors now or hereafter in effect or such a petition shall be filed against Issuer (and shall not be dismissed within 90 days); (ii) make an assignment for the benefit of its creditors or consent to the appointment of a receiver of the whole or any substantial part of its property, (iii) declare or announce dissolution, (iv) become the subject of an order for the winding up of Issuer not dismissed within 90 days of issuance thereof, (v) become the subject of any assignment for the benefit of creditors, receivership, moratorium, composition or other similar event or proceeding, or (vi) be unable to pay its debts when due or admit in writing its

-22-

WEIL:\96847771\6\44549.0003
3579\04-12)

inability to pay its debts when due;

(i) if any provision of any Note Documents shall for any reason (other than in accordance with its express terms) cease to be valid and binding on, or enforceable against, the Issuer or any Guarantor, or the Issuer or any Guarantor shall so assert in writing;

(j) [Reserved];

(k) actual or asserted invalidity or repudiation by Issuer, any Guarantor or any of Issuer's Subsidiaries of (i) any Note Documents other than this Agreement, or (ii) any lack of perfection or senior priority (subject to Permitted Liens) status of any security interest covering or applicable to the Collateral; or

(l) failure to deliver the agreements, collateral and other documents as specified in Section 1.5 by the agreed times.

## 6.2. REMEDIES

Upon the occurrence and during the continuance of an Event of Default, the Noteholder at its option may (a) declare all the Note to be due and payable, whereupon the same shall forthwith mature and become due and payable, together with interest accrued thereon, without presentment, demand, protest or notice, all of which are hereby waived by the Issuer; and (b) declare any other amounts payable to the Noteholder under this Agreement or as contemplated hereby due and payable; provided, however, that upon the occurrence of an Event of Default under Section 6.1(h), the Note, together with interest accrued thereon, shall automatically become and be due and payable, without presentment, demand, protest or notice of any kind, or any other action of the Noteholder of any kind, all of which are hereby waived by the Issuer. Notwithstanding anything herein to the contrary, an Event of Default under Section 6.1(a) shall be deemed not to occur until the fifteenth (15th) day following the occurrence thereof and such Event of Default shall be deemed not to have occurred so long as within such fifteen (15) day period Issuer shall have cured such Event of Default by funding the relevant payment with proceeds of an Equity Issuance (such Equity Issuance, an "Equity Cure").

## 6.3. ENFORCEMENT

In case any one or more Events of Default shall occur and be continuing, the Noteholder may proceed to protect and enforce its rights by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement in favor of the Noteholder which is contained in any of the Note Documents or in the Note or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law (including, without limitation, the right to foreclose upon and sell the Collateral and enforce the Guaranties, each in accordance with its respective terms). No course of dealing and no delay on the part of the Noteholder in exercising any rights shall operate as a waiver thereof or otherwise prejudice the Noteholder's rights. No right conferred

WEIL:\96477716\6\44349.0003
3579134-v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2

INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

hereby or by the Note upon any holder thereof shall be exclusive of any other right referred to herein or therein or now available at law or in equity, by statute or otherwise.

## ARTICLE VII

## INDEMNIFICATION; TAXES; WAIVER OF SET OFF

(a)     [Reserved].

(b)     If the Issuer or Guarantors are required by law to deduct or withhold any present or future income, stamp, documentary, excise or other taxes or levies, imposts, deductions, charges, compulsory notes or other withholdings whatsoever imposed, assessed, levied or collected by any state, province or nation or any political subdivision or taxing authority or other agency thereof or therein (collectively hereinafter referred to as "Taxes"), from any payment required to be made under any Note Document, such payment shall be made net of such deduction or withholding (and such payment as so reduced shall be deemed to constitute payment in full of such required payment) and Issuer shall, or shall cause the applicable Guarantors to, furnish to the Noteholder a copy of any receipt or other confirmation evidencing payment thereof within thirty (30) days (or such later date as such receipt or other confirmation is made available to Issuer) after said payment is made.

(c)     If the Noteholder is entitled to an exemption from or reduction of withholding Tax with respect to payments made under the Note Documents, the Noteholder shall deliver to Issuer, at or prior to the Closing Date and at such other time or times reasonably requested by Issuer, such properly completed and executed documentation, such as an original, executed Form W-9 or Form W-8, as applicable, as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, the Noteholder shall deliver to Issuer such other documentation prescribed by applicable law or reasonably requested by Issuer as will enable Issuer to determine whether or not the Noteholder is subject to backup withholding or information reporting requirements. The Noteholder agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Issuer in writing of its legal inability to do so.

(d)     The Issuer irrevocably waive any rights of set off or recoupment against the Note for any Losses that may arise under, or in connection with, the Share Sale Agreement or any documents executed in connection with the Share Sale Agreement, it being understood that any rights in favor of Issuer or any Guarantor under the Share Sale Agreement or any document executed in connection with the Share Sale Agreement, may not be exercised as a defense under this Agreement and Issuer hereby ratifies and affirms its obligations to pay and perform under this Agreement notwithstanding any dispute under the Share Sale Agreement or any document executed in connection with the Share Sale Agreement.

## ARTICLE VIII

-24-

WEIL:\96477718\14\54516.0005
3579134-v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM          INDEX NO. 650026/2018

NYSCEF DOC. NO. 2                                          RECEIVED NYSCEF: 01/03/2018

## AMENDMENT AND WAIVER

No amendment of any provision of this Agreement, including any amendment of this Article VIII, shall be valid unless the same shall be in writing and signed by the Issuer and the Noteholder. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder or under any other Note Documents, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or thereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

## ARTICLE IX

## CURRENCY

All payments shall be in US Dollars.

## ARTICLE X

## MISCELLANEOUS

### 10.1.  GOVERNING LAW

This Agreement and the rights of the parties hereunder shall be governed in all respects by the laws of the State of New York wherein the terms of this Agreement were negotiated, excluding to the greatest extent permitted by law any rule of law that would cause the application of the laws of any jurisdiction other than the State of New York. Issuer submits to the non-exclusive jurisdiction of the Federal and State courts having jurisdiction over New York, New York in any case or controversy arising under this Agreement.

### 10.2.  SUCCESSORS AND ASSIGNS

Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon and enforceable by and against, the parties hereto and their respective successors, assigns, heirs, executors and administrators. The Issuer may not assign any of its rights hereunder without the prior written consent of the Noteholder; provided, that the transferee will be subject to the applicable terms of the Note Documents to the same extent as if such transferee were an original Noteholder hereunder. The Noteholder may assign the Note or any of its rights hereunder or under any other Note Document to any of its Affiliates or, subject to the prior written consent of the Issuer (such consent (a) not to be unreasonably withheld and (b) not to be required if an Event of Default has occurred and is continuing), any other Person. Subject to the recording of the transfer the Note by Issuer (subject to the prior receipt of Issuer's consent if and as required by this Section 10.2), (i) the transferee thereunder shall become a party hereto as the Noteholder and shall execute and deliver such joinders to this Agreement and other documentation as may be reasonably requested by Issuer and (ii) the transferor of the Note shall

-25-

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

relinquish its rights and be released from its obligations under the Note Documents and shall cease to be a party to the Note Documents.

## 10.3. ENTIRE AGREEMENT

This Agreement (including the Exhibits hereto), the other Note Documents and any other documents delivered pursuant hereto and simultaneously herewith constitute the full and entire understanding and agreement between the parties with regard to the subject matter hereof and thereof.

## 10.4. NOTICES

All notices, demands or other communications given hereunder shall be in writing and shall be sufficiently given if transmitted by facsimile or delivered either personally or by a nationally recognized courier service marked for next Business Day delivery or sent in a sealed envelope by first class mail, postage prepaid and either registered or certified, return receipt requested, addressed as follows:

(a)    If to the Issuer:

c/o Exceptional Innovation
480 Olde Worthington Road, Suite 350
Westerville, OH 43082 USA
Attention: Seale Moorer
Facsimile: 1 (614) 890-6091

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065 USA
Attention: Gabriel Gregson
Facsimile: 1 (650) 802-3100

(b)    If to Noteholder:

Sanno Park Tower 41st F
2-11-1 Nagata-cho, Chiyoda-ku
Tokyo 100-6150 Japan
Attention: Managing Director of the Global Business Division
Facsimile: +81 3 5156 0203

-26-

WEIL:\96477718\6\44349.0003
5579134-v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM          INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                        RECEIVED NYSCEF: 01/03/2018

Any such notice, demand or communication shall be deemed to have been given (i) on the date of delivery, if delivered personally, (ii) on the date of facsimile transmission, receipt confirmed, (iii) one Business Day after delivery to a nationally recognized overnight courier service, if marked for next day delivery, or (iv) five Business Days after the date of mailing, if mailed.

## 10.5.  DELAYS, OMISSIONS OR WAIVERS

No delay or omission to exercise any right, power or remedy accruing to the Noteholder upon any breach or default of the Issuer under this Agreement shall impair any such right, power or remedy of the Noteholder nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring. Any permit, consent or approval of any kind or character on the part of the Noteholder of any breach or default under this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to the Noteholder, shall be cumulative and not alternative.

## 10.6.  INDEPENDENCE OF COVENANTS AND REPRESENTATIONS AND WARRANTIES

All covenants hereunder shall be given independent effect so that if a certain action or condition constitutes a default under a certain covenant, the fact that such action or condition is permitted by another covenant shall not affect the occurrence of such default. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of or a breach of a representation and warranty hereunder.

## 10.7.  RIGHTS AND OBLIGATIONS; SEVERABILITY

In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## 10.8.  EXPENSES

(a)     The Issuer shall bear its own expenses and legal fees incurred on its behalf with respect to the negotiation, execution and consummation of the transactions contemplated by this Agreement, and the Issuer will reimburse the Noteholder for all reasonable and documented out-of-pocket legal fees and expenses incurred by the Noteholder with respect to the negotiation, execution and delivery of the Note Documents in an aggregate amount not to exceed $100,000,

WEIL:\95477731\6\44840.0003
3579134\12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM          INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                                  RECEIVED NYSCEF: 01/03/2018

and such amount required to be reimbursed to Noteholder by Issuer shall be payable by Issuer when invoiced after the Closing.

(b)    Issuer also agrees to reimburse the Noteholder for all reasonable and documented out-of-pocket legal fees and expenses subsequently incurred by the Noteholder in connection with the negotiation, execution and delivery following the Closing Date of any additional Note Documents or any amendment, waiver or consent with respect to any Note Document.

(c)    The Issuer further agrees to pay or reimburse the Noteholder for all reasonable and documented out-of-pocket costs and expenses, including, without limitation, reasonable and documented out-of-pocket attorneys' fees and disbursements incurred by the Noteholder after the occurrence of an Event of Default (i) in enforcing any obligation of Issuer and the Guarantors under the Note Documents or in foreclosing against the Collateral or exercising or enforcing any other right or remedy available by reason of such Event of Default; (ii) in connection with any negotiation, refinancing or restructuring of, or attempted refinancing or restructuring of, the credit arrangements provided under this Agreement and the other Note Documents in the nature of a "work-out" or in any insolvency or bankruptcy proceeding; (iii) in commencing, defending or intervening in any litigation or in filing a petition, complaint, answer, motion or other pleadings in any legal proceeding relating to either Issuer or any of its Affiliates and related to or arising out of the transactions contemplated hereby or by any of the other Note Documents; (iv) in taking any other action in or with respect to any suit or proceeding (whether in bankruptcy or otherwise) arising out of or in connection with this Agreement or any of the other Note Documents; (v) in protecting, preserving, collecting, leasing, selling, taking possession of, or liquidating any of the Collateral in accordance with the terms of the Note Documents; or (vi) attempting to enforce or enforcing any security interest in any of the Collateral or any other rights under any Note Documents in accordance with the terms thereof;

(d)    For the avoidance of doubt, Issuer's obligations under this Section shall not extend to amounts incurred in connection with or otherwise relating to the Share Sale Agreement or the transactions contemplated thereby or the documents and agreements entered into in connection therewith, other than the Note Documents.

WEIL\96477180\4\34B.0003
3579134-v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM

NYSCEF DOC. NO. 2

INDEX NO. 650026/2018

RECEIVED NYSCEF: 01/03/2018

## 10.9. JURISDICTION

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or United States Federal court sitting in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Note Documents to which it is a party or to whose benefit it is entitled, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such United States Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Note Documents in the courts of any other jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or in relation to this Agreement or any other Note Documents to which it is a party in any such New York State or United States Federal court sitting in New York, New York. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

## 10.10. WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY NOTE DOCUMENTS OR THE ACTIONS OF ANY PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

## 10.11. TITLES AND SUBTITLES

The titles of the articles, sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

## 10.12. COUNTERPARTS

This Agreement may be executed in any number of counterparts, including by facsimile copy, each of which shall be deemed an original, but all of which together shall constitute one instrument.

WEIL:\95477\18\6\14349.0003
3379130-118

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

## 10.13. MARSHALLING; RECOURSE TO SECURITY; PAYMENTS SET ASIDE

The Noteholder shall not be under any obligation to marshal any assets in favor of the Issuer or any of its Affiliates or any other party or against or in payment of any or all of the Note or other obligations hereunder. Recourse to security shall not be required at any time. To the extent that the Issuer makes a payment or payments to the Noteholder or the Noteholder enforces its security interests or exercises its rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

## ARTICLE XI

## REPRESENTATIONS AND WARRANTIES OF THE NOTEHOLDER

As a material inducement to Issuer to issue the Notes and the Guarantors to guarantee the repayment thereof, the Noteholder hereby represents and warrants to Issuer and the Guarantors as follows as of the date hereof:

### 11.1. INVESTMENT INTENT

The Notes are and will be acquired pursuant hereto for the Noteholder's own account with the present intention of holding such securities for purposes of investment, and it has no intention of selling such securities in a distribution in violation of the United States federal securities laws or any applicable state securities laws.

### 11.2. NO REGISTRATION

The Noteholder acknowledges that Issuer is entering into this Agreement, and will not be registering or qualifying the offer or sale of the Notes under the Securities Act or applicable state securities laws, in reliance upon the truth and accuracy of the Noteholder's representations and warranties in this Article XI.

### 11.3. INFORMATION

The Noteholder has been furnished all materials relating to Issuer and the Guarantors and the securities that it has requested and has been afforded the opportunity to obtain any additional information necessary to evaluate its participation in the transactions contemplated by this Agreement;

WEIL:\0517771\84\84348.0500
357\/134\ v12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM
NYSCEF DOC. NO. 2
INDEX NO. 650026/2018
RECEIVED NYSCEF: 01/03/2018

## 11.4.  SOPHISTICATION

The Noteholder has the necessary knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of its participation in the transactions contemplated by this Agreement.

## ARTICLE XII

## CERTAIN DEFINED TERMS

For purposes of this Agreement, the following terms have the meanings indicated (unless otherwise expressly provided herein):

"1940 Act" means the Investment Borrower Act of 1940, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the 1940 Act shall be deemed to include any corresponding provisions of future law.

"Affiliate" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, membership interests, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble hereto.

"Asset Disposition" means the disposition of any or all of the assets (including, without limitation, any Capital Stock owned thereby) of any of the Issuer or Guarantors whether by sale, lease, transfer or otherwise, and any issuance of Capital Stock by any Subsidiary to any Person that is not the Issuer or a Guarantor. The term "Asset Disposition" shall not include (a) any Equity Issuance, (b) the sale of inventory in the ordinary course of business, (c) the transfer of assets to Issuer or any Guarantor pursuant to any other transaction permitted pursuant to Section 5.11, (d) the write-off, discount, sale or other disposition of defaulted or past-due receivables and similar obligations in the ordinary course of business and not undertaken as part of an accounts receivable financing transaction, (e) dispositions of investments in cash and cash equivalents, and (f) the transfer by the Issuer or any Guarantor to the other (provided that in connection with any new transfer, such recipient shall not pay more than an amount equal to the fair market value of such assets as determined in good faith at the time of such transfer).

"Board of Directors" means, as to any Person, the board of directors or equivalent managers or governing body of such Person.

-51-

WEIL:\95477738\4\44349.0003
3579134-12\

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 01/03/2018

"Business Day" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City, New York, Cleveland, Ohio or Tokyo, Japan.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests, (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person and (f) any and all warrants, rights or options to purchase any of the foregoing.

"Change of Control" means the occurrence of any of the following: (a) the Issuer consolidates with, or merges with or into, another Person (other than a direct or wholly owned Subsidiary) or sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of the assets of the Issuer and its Subsidiaries taken as a whole to any Person, or any Person consolidates with, or merges with or into, the Issuer, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Issuer, as the case may be, is converted into or exchanged for cash, securities or other property, other than any such transaction where the outstanding Voting Stock of the Issuer, as the case may be, is converted into or exchanged for Voting Stock of the surviving or transferee corporation and the beneficial owners of the Voting Stock of the Issuer immediately prior to such transaction own, directly or indirectly, not less than a majority of the Voting Stock of the surviving or transferee corporation immediately after such transaction, or (b) the Issuer, either individually or in conjunction with one or more Subsidiaries, sells, assigns, conveys, transfers, leases or otherwise disposes of, or the Subsidiaries sell, assign, convey, transfer, lease other otherwise dispose of, all or substantially all of the properties and assets of the Issuer and its Subsidiaries, taken as a whole (either in one transaction or a series of related transactions), including Capital Stock of the Subsidiaries, to any Person (other than the Issuer or a wholly owned Subsidiary of the Issuer). For purposes of this definition, the term "Voting Stock" of the Issuer means securities of any class of Capital Stock of the Issuer entitling the holders thereof to vote in the election of members of the Board of Directors of Issuer.

"Closing Date" means the date on which all conditions to the Closing have been satisfied in full or waived in accordance with the terms hereof.

"Code" means the Internal Revenue Code of 1986, as amended, and any applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Code shall be deemed to include any corresponding provisions of future law.

"Collateral" means the collateral security granted to the Noteholder pursuant to the Security Agreements and the other Note Documents.

WEIL:\96547771\8\64348.0008
3579134.v12

FILED: NEW YORK COUNTY CLERK 01/03/2018 11:03 AM    INDEX NO. 650026/2018

NYSCEF DOC. NO. 2    RECEIVED NYSCEF: 01/03/2018

"Conversion Date" has the meaning set forth in Section 1.5.

"Debt Issuance" means the issuance of any Indebtedness for borrowed money by any of the Issuer or any Guarantor.

"Debtor Relief Laws" means the United States Bankruptcy Code, as amended, and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"EI" means Exceptional Innovation Intermediate B.V..

"Equity Cure" has the meaning set forth in Section 6.2.

"Equity Issuance" means (a) any issuance by any of the Issuer, any Guarantor or any of Issuer's Subsidiaries of (i) shares of its Capital Stock, (ii) any shares of its Capital Stock pursuant to the exercise of options or warrants or (iii) any shares of its Capital Stock pursuant to the conversion of any debt securities to equity and (b) any capital contribution from any Person that is not the Issuer, a Guarantor, or a Subsidiary of Issuer into any of the Issuer, Guarantor, or Subsidiary of Issuer. The term "Equity Issuance" shall not include (A) any Asset Disposition or (B) any Debt Issuance.

"Existing EI Loans" means the loans outstanding under that certain £50,000,000 Facility Agreement, dated 30 June 2015, among, EI, Exceptional Innovation B.V., the guarantors party thereto, the lenders from time to time party thereto, Assured Risk Transfer, LLC, as agent and arranger, and Deutsche Bank Trust Company Americas as security agent, paying agent and account bank.

"GAAP" means generally accepted accounting principles in the United States.

"Guaranties" means those certain Guaranty Agreements, of even date herewith, entered into by the Guarantors in favor of the Noteholder.

"Guarantors" means ST Holdings and interTouch Topco LLC and each of their successors and permitted assigns, and following the Nomadix Transfer Date, Nomadix and each of its successors and permitted assigns.

"Indebtedness" of any Person means, without duplication, (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than trade payables and accrued liabilities in the ordinary course of business on reasonable, commercial terms); (c) all non-contingent reimbursement or payment obligations with respect to surety instruments; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in

-33-