## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| interTouch Topco LLC, *et al.*,[1] | Case No. 18-12773 (BLS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 4 and 5** |

**OMNIBUS OBJECTION BY DEBTORS TO GATE WORLDWIDE HOLDINGS LLC'S
(I)    EMERGENCY MOTION TO DISMISS THE DEBTORS'
CHAPTER 11 CASES PURSUANT TO § 1112(b) AND/OR ABSTAIN FOR [*SIC*]
HEARING DEBTORS' CHAPTER 11 CASES PURSUANT TO § 305(a) OF THE
BANKRUPTCY CODE; AND
(II)    EMERGENCY MOTION FOR ENTRY OF AN ORDER
GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO
SECTIONS 362(d) AND (f) OF THE BANKRUPTCY CODE**

interTouch Holdings LLC ("Holdings") and interTouch Topco LLC ("Topco"), the above-captioned debtors and debtors-in-possession (together, the "Debtors"), by and through their proposed undersigned counsel, hereby oppose the motions by Gate Worldwide Holdings LLC ("Gate") (a) to dismiss their Chapter 11 Cases [D.I. 4; filed 12/13/18] (the "Motion to Dismiss" or "MTD") and (b) for stay relief [D.I. 5; filed 12/13/18]  (the "Stay Relief Motion" or "SRM"). In support hereof, the Debtors hereby incorporate the Declaration of Seale A. Moorer, Jr. (the "Moorer Declaration), filed concurrently herewith, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.    By seeking for chapter 11 relief, the Debtors properly invoked the protections against precisely the types of predatory creditor practices Gate now asks this Court to condone.

---

[1]    The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: interTouch Holdings LLC (2091) and interTouch Topco LLC (6381).  The Debtors' headquarters is located at 480 Olde Worthington Road, Suite 350, Westville, OH 43082.

While the New York Court may be well equipped to liquidate and shut down all of the Debtors' going concerns for scraps for Gate's sole benefit, this Court only, under the auspices of the Bankruptcy Code, is able to realize the opportunity to preserve value: to allow existing management to restructure business operations and preserve going concerns, goodwill, and jobs. This Court is the right place for the Debtors to be; here is where the Debtors should stay. Outside of bankruptcy, all of the Debtors' value immediately will be lost.

    2.    The Debtors and Gate are competitors in the hospitality managed services vertical market. That is, both cater to a niche market and target specific types of consumers. Presently, this vertical market is undergoing a tremendous global consolidation, with major global hotel brands seeking a small number of global service providers to provide the same look and feel (i.e. same services and solutions) to their branded properties wherever located around the world. Since 2015, the Debtors have been working to bring together a number of large regional providers under a single umbrella to service all major hotel brands across all major geographic regions. Gate now is seeking to do the same. In 2017, Gate seized the opportunity to take advantage of the Debtors' financial distress, purchased the Note (later defined), likely at a significant discount, with the intent to systematically foreclose on the Debtors' assets and affiliated assets at a further distressed discount, and reap the financial benefits and spoils of being the first group to obtain single global provider status in the hospitality vertical market. In furtherance of its business objectives, Gate will spare no detriment to the Debtors, their equity holdings, their operating subsidiaries, and the Debtors' unsecured creditors. To prevent this from happening, the Debtors must remain in chapter 11 and be granted the continued protections of the automatic stay-particularly as against Gate. The motions to dismiss and for stay relief, therefore, must be denied.

## CASE BACKGROUND

3.       On December 10, 2018 (the "Petition Date"), each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code (together, the "Chapter 11 Cases"). The Debtors are operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**The Debtors Were Formed to Acquire Operating Businesses Through Which They Provide Products and Services to the Hospitality Industry**

4.       Topco and Holdings both are Delaware limited liability companies formed in 2015 for the purpose of acquiring two existing operating businesses.  Topco is Holdings' 100% parent and the wholly-owned subsidiary of non-debtor ST Holdings LLC.  The businesses they were formed to acquire are Nomadix, Inc. ("Nomadix"), a Delaware corporation with a principal place of business in Agoura Hills, California, and interTouch Pte. Ltd., a Singapore company, and its subsidiaries (collectively, "interTouch").

5.       In Nomadix, the Debtors acquired a profitable company that, for over twenty years, has engaged in the manufacture and sale of gateway devices and licensing of software solutions that facilitate internet access for mobile users at public locations and are used extensively in the hospitality and other visitor-based industries.  Nomadix has approximately three dozen employees and a handful of contractors.  Its product sells globally through a sales channel that numbers over 600 authorized distributors and resellers. Nomadix currently has well over 10,000 active licensed units globally, including businesses such as hotels, convention centers, schools, hospitals, airports, stadiums, retail stores, office businesses, multi-dwelling units, and the like, that depend on Nomadix's ongoing daily service, support, and software maintenance to maintain internet service. Nomadix' stream of income is derived chiefly from these products and from its largest asset, a

substantial patent portfolio developed over many years and including patents that are seminal to the provision of internet service in public places.

6.      In interTouch, the Debtors acquired one of the leading global providers of technology-based services and solutions to the hospitality industry in Asia-Pacific, Australia, Middle-East, Africa, and Central and Latin America.  interTouch's solutions include wired and wireless high-speed internet access, digital television, video-on-demand, digital signage, and other in-room entertainment and networking solutions to guestrooms, conference facilities, and other common areas.  interTouch provides services to over 1,000 hotel properties and operates in over 46 countries.   Its customers include some of the top hospitality brands in the world.

7.      interTouch likewise is a valuable operating business, from which the Debtors generate the bulk of their revenue.  interTouch and Nomadix are fully vertically integrated and function as a team:  Nomadix is an important software engine, and interTouch provides the rest of the solutions on top of that engine.  Both companies work hand in hand to produce optimal value.

**In Connection with the Financing and Acquisition of Nomadix and interTouch, Holdings and Certain of its Affiliates Entered into a Series of Agreements Guaranteeing Holdings' Obligations and Granting DoCoMo a Security Interest in Collateral Held by Nomadix**

8.      Both Nomadix and interTouch were acquired from NTT DoCoMo, Inc. ("DoCoMo"), a Japanese corporation and predominant Japanese mobile phone operator. DoCoMo agreed to partially finance the acquisition[2] and, to that end, entered into a series of documents hereinafter referred to as the "Financing Documents."  These Financing Documents are described below and are incorporated herein by reference.

---

[2]      DoCoMo's parent company is Nippon Telegraph and Telephone Corporation ("NTT"), a Japanese telecommunications company headquartered in Tokyo, Japan. Ranked 65th in Fortune Global 500, NTT is the fourth largest telecommunications company in the world in terms of revenue.

*The Note (Holdings)*

9.      On September 29, 2015, Holdings (the "Issuer") entered into a Note Purchase

Agreement (the "NPA") with DoCoMo and, in exchange, Holdings executed and delivered to

DoCoMo a promissory note in the original principal amount of fifty-five million dollars

($55,000,000) (the "Note" or "NPA").  A true and correct copy of the Note is attached hereto as

**Exhibit A**.

10.     The Note provides:

> All of the obligations of the Issuer under the Note shall be secured
> by the Collateral upon and subject to the terms of the Security
> Agreements and the other Note Documents.

Note, Art. 1.5.

11.      "Collateral," "Security Agreements," and "Note Documents," and other terms used

in the Financing Documents and relevant hereto are defined in the Note as follows:

> "Collateral" means the collateral security granted to the Noteholder
> pursuant to the Security Agreements and the other Note Documents.
>
> "Guaranties" means those certain Guaranty Agreements, of even
> date herewith, entered into by the Guarantors in favor of the
> Noteholder.
>
> "Guarantors" means ST Holdings and interTouch Topco LLC and
> each of their successors and permitted assigns, and … Nomadix and
> each of its successors and permitted assigns.
>
> "Note Documents" means, collectively, (a) this Agreement, (b) the
> Note, (c) the Security Agreements, and (d) the Guaranties.
>
> "Noteholder" [means DoCoMo].
>
> "Obligations" means all advances, debts, liabilities, obligations,
> covenants and duties arising under any Note Documents owing by
> the Issuer to the Noteholder, whether direct or indirect (including
> those acquired by assignment), absolute or contingent, due or to
> become due, now existing or hereafter arising.

"Security Agreements" means i) upon execution and delivery thereof, the ST Stock Pledge, ii) that certain Pledge Agreement of even date herewith, by and between ST Holdings and Noteholder, iii) that certain Pledge Agreement, of even date herewith, by and between interTouch Topco, LLC and Noteholder and iv) that certain Patent Security Agreement, when executed and delivered pursuant to this Agreement, by and between Nomadix, Inc. and Noteholder, as such agreements may be supplemented, amended or otherwise modified from time to time in accordance with their terms.

*Id*. at 12.

12.     Pursuant to the Note, Holdings, as Issuer, contractually obligated itself to cause the Guarantors–Topco, Nomadix, and ST Holdings LLC–as well as its wholly-owned subsidiaries– Nomadix and interTouch–to perform in accordance with the terms of the Note.  The Note provides, for example:

(a)     *The Issuer shall, and shall cause the Guarantors to*, maintain in full force and effect its organizational existence and, except as would not reasonably be expected to have a Material Adverse Effect, rights and franchises.

(b)     *The Issuer shall, and shall cause the Guarantors to*, keep each of its properties necessary to the conduct of its business in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needful and proper repairs, renewals, replacements, additions and improvements thereto; *and the Issuer shall, and shall cause the Guarantors to*, at all times comply with each provision of all leases to which it is a party or under which it occupies property, except, in each case, as would not reasonably be expected to have a Material Adverse Effect.

(c)     *The Issuer shall, and shall cause the Guarantors to*, … promptly pay and discharge, or cause to be paid and discharged when not overdue, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, assets, property or business of the Issuer and the Guarantors, …

(d)     [Reserved].

(e)     *The Issuer shall, and shall cause the Guarantors to*, keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by theft, fire, explosion and other risks customarily insured against by companies

> in the line of business of the Issuer or the relevant Guarantor, in amounts sufficient to prevent the Issuer or the relevant Guarantor from becoming a co-insurer of the property insured; and the Issuer shall, and shall cause the Guarantors to, maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to Persons and property …

*Id*. at 4.1 (*emphasis* added).

> *The Issuer shall, and shall cause any of its Subsidiaries to, comply with the terms and conditions of all material agreements, commitments or instruments to which the Issuer or any of its Subsidiaries is a party or by which it or they may be bound*, except to the extent such noncompliance would not reasonably be expected to have a Material Adverse Effect. *The Issuer shall, and shall cause each of its Subsidiaries to, duly comply with any applicable Legal Requirements relating to the conduct of their respective businesses, properties or assets*, except to the extent such noncompliance would not reasonably be expected to have a Material Adverse Effect.

*Id*. at 4.4 (*emphasis* added).

> *The Issuer shall, and shall cause its Subsidiaries to, take commercially reasonably actions necessary to maintain, defend and protect its rights in* all material trademarks, trade names, service marks, patents, patent applications and other *material intellectual property owned by Issuer or such Subsidiary (including, without limitation, the Nomadix Patents) …*
>
> *The Issuer shall keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to the business and affairs of the Issuer and its Subsidiaries in accordance with GAAP applied on a consistent basis.*
>
> *The Issuer shall permit the Noteholder* (or representatives on behalf of the Noteholder) during regular business hours selected by the Issuer, upon reasonable advance notice, *to visit the offices of the Issuer and its Subsidiaries to inspect the Collateral …*

*Id*. at 4.5 (*emphasis* added). The foregoing excerpts illustrate that Holdings, as Issuer, holds full power and authority over the Guarantors and its Subsidiaries, all of which operate at the sole direction of Holdings.

*The Guaranties (Topco, Nomadix, and ST Holdings LLC)*

13.     As noted, simultaneously with the Note, three entities affiliated with Holdings executed guaranties as further security for the Obligations: Topco, Nomadix, and ST Holdings LLC.  The guaranties are virtually identical and all provide that, in the event of a default under the Note by Holdings, DoCoMo can look to the Guarantors for payment of outstanding Obligations.[3] A true and correct copy of the Nomadix Guaranty is attached hereto as **Exhibit B**.

*The Patent Security Agreement (Nomadix)*

14.     The Patent Security Agreement is one of the Security Agreements referenced in the Note and states that DoCoMo, as Noteholder, requires Nomadix, as one of the Guarantors of Holdings' debt obligation, to enter into the Patent Security Agreement as part of the financed acquisition of Nomadix and interTouch and as security for the Nomadix Guaranty.  A true and correct copy of the Patent Security Agreement is attached hereto as **Exhibit C**.  It provides:

W I T N E S S E T H:

> WHEREAS, pursuant to that certain Note Purchase Agreement dated September 29, 2015, by and between interTouch Holdings LLC ("Issuer") and Noteholder (as amended or otherwise modified from time to time, the "NPA"; capitalized terms used but not otherwise defined herein having the respective meanings ascribed to them in the NPA), the Noteholder has accepted and holds that certain Promissory Note issued by the Issuer dated September 29, 2015 in an original principal amount of $55,000,000 (the "Note") for a portion of the purchase price under the Share Sale Agreement;

> WHEREAS, Guarantor and Noteholder have entered into that certain Guaranty dated [September 29], 2015 (as amended or otherwise modified from time to time, the "Guaranty"), providing for, among other items, the guaranty by Guarantor of Issuer's obligations under the NPA; and

---

[3]     The Note Purchase Agreement provided that the guaranty from ST Holdings LLC would become non-recourse after the execution of the ST Stock Pledge.

WHEREAS, Noteholder has required, as a condition to its receipt of the Note under the NPA, that Guarantor enter into this Agreement with Noteholder.

15.     The Patent Security Agreement further provides that Nomadix grants DoCoMo a security interest in Nomadix's patent portfolio, which shall serve as Collateral for all "Obligations," defined in the Nomadix Guaranty as those obligations "arising out of or in connection with or with respect to the [NPA], any other Note Document, or any other instrument or agreement from time to time between the Issuer and the Noteholder."  Section 2 of Nomadix Guaranty.  To wit:

AGREEMENT

NOW THEREFORE, in consideration of the premises and in order to induce Noteholder to accept and hold the Note, Guarantor hereby agrees with Noteholder as follows:

1.     Security Interest.  Guarantor hereby grants to Noteholder a security interest in and to all of its right, title and interest in and to the collateral described in Section 2 herein (the "Collateral") in order to secure the payment of all Obligations (as defined in the Guaranty) and the performance of all the obligations related thereto.

2.     Collateral; Financing Statement; Perfection.  The Collateral is: (a) all patents and patent applications owned by Guarantor including, without limitation, the patents and patent applications listed on Schedule A attached hereto and made a part hereof, together with all reissues, divisions, continuations, renewals, reexaminations, extensions and continuations-in-part of any of the foregoing (the "Patents"); (b) the inventions claimed in the Patents; (c) all income, royalties, damages and payments now and hereafter due or payable with respect to any of the Patents, including, without limitation, payments under all licenses entered into with respect to the Patents and damages and payments for past or future infringements of the Patents; and (d) the right to sue for past, present and future infringements of the Patents.  The Noteholder is expressly authorized to file financing statements in respect of the Collateral and to record this Agreement with the United States Patent and Trademark Office or other equivalent governmental body as necessary or desirable to perfect or give effect to the security interest

created herein.

Patent Security Agreement, Sections 1 and 2. Schedule A to the Patent Security Agreements lists the patents owned by Nomadix that are part of the Collateral.

***The Membership Interest Pledge Agreements (Topco and ST Holdings LLC)***

16.     In addition to the foregoing, Topco and ST Holdings LLC each entered into a Membership Interest Pledge Agreement (together, the "Pledge Agreements" and each a "Pledge Agreement") with DoCoMo, pursuant to which each entity pledged all ownership interests (the "Pledged Stock") it owned at the time the Note was executed. The Pledge Agreements define Pledged Stock as follows:

> "Pledged Stock" shall mean the membership interest units of the Issuer owned by Pledgor, as such amount may be adjusted from time to time by the Issuer, pursuant to splits, together with all certificates, options, or rights of any nature whatsoever that may be issued or granted in such membership interest units by the Issuer to the Pledgor while this Agreement is in effect.

Included, then, in the Pledged Stock is Topco's ownership interest in Holdings.

**Pre-Petition, the Debtors Undertook to Refinance and Restructure their Assets and Entered into a Binding Memorandum of Understanding with an Investment Firm**

17.     Beginning in mid-2016, the Debtors started to explore refinancing options. To that end, they engaged the services of FTI Consulting to validate their view of the value of the intellectual property held by their wholly-owned subsidiary Nomadix that had been pledged to DoCoMo as security for the Note. FTI Consulting is a prominent global financial advisory and forensic and litigation support firm with a strong background in the valuation of intellectual property whose professionals have been recognized as leading patent litigation expert witnesses. Specifically, FTI Consulting was engaged to review the patent royalty history and data to aid Nomadix's management team in determining the potential royalty stream and making cash-flow projections, based on a number of assumptions, related to certain portions of the Nomadix's patent portfolio.

10

18.     After six months of an extensive amount of research and dialogue with Nomadix and Nomadix's outside intellectual property legal team, FTI Consulting completed their evaluation of the data and provided Nomadix with its findings in January, 2017 (the "FTI Model"). The FTI Model confirmed that the value of Nomadix's patent portfolio by far exceeds the Debtors' Obligations under the Note.  The idea was that the FTI Model, by enabling the Debtors to make informed revenue and cash flow projections, would support future efforts to secure a successful financing transaction.

19.     In February 2018, the Debtors were introduced to the Tiller International Capital LLC ("Tiller"), a global multinational investment firm formed by Anthony N. Georgiou in 1972. Tiller and its subsidiaries together employ approximately 160,000 people across 76 countries.

20.     After a few meetings between Mr. Georgiou and Mr. Moorer, the Debtors' principal, Tiller, on March 2, signed a Nondisclosure Agreement and performed due diligence in connection with exploring investment opportunities in Holdings.  Following several additional meetings and further discussions, ST Holdings secured a binding commitment from Tiller to finance the Debtors, which was memorialized in a binding Memorandum of Understanding dated as of May 22, 2018 (the "MOU").  The MOU obligated Tiller to make two capital contributions in the respective approximate amounts of $55 million and $20 million and contemplated, among other things, the creation of two new joint ventures, as well as a corporate restructuring of the ST Holdings subsidiaries for the purpose of expanding the business of Topco and its direct and indirect subsidiaries both domestically and internationally (collectively, the "Tiller Transaction").  The cash derived from the Tiller Transaction was intended to eliminate Holdings' Obligations under the Note, eliminate the need to pay for debt service, and to fund an expansion of existing business and profitability overall.

21.    In preparation for the Tiller Transaction, two new joint venture entities were formed on March 30, that adopted bylaws in June.  Shareholder agreements and certain Subscription and Asset Contribution Agreements to complete and consummate the Tiller Transaction were executed on June 17, 2019.  On that day, all conditions to funding were satisfied.

22.    It had been anticipated Tiller would fund the transactions no later than Friday, December 7, 2018. The source of Tiller's investment was to be a loan secured by certain assets of Tiller. The assets serving as collateral were required to be appraised, and unfortunately, the appraisal process was not completed by this deadline.

23.    As late as January 2, 2019, Tiller has provided confirmation that it would soon be able to meet its investment obligations contemplated by the Tiller Transaction.

**Holdings Defaults on the Note and Gate Buys the Defaulted Note from DoCoMo**

24.    Despite its efforts to timely refinance the Note, Holdings defaulted thereunder when it was unable to pay all outstanding amounts owing on the Maturity Date, or March 31, 2017.

25.    On September 5, 2017, Gate purchased the defaulted Note from DoCoMo.

26.    In late 2017, Gate acquired an equity stake in GlobalReach Technology,[4] a

---

[4]    *See* press release available online at https://www.globalreachtech.com/news/global-reach-secures-equity-partner-in-support-of-its-global-expansion-and-transition-to-a-us-based-corporation/ (last visited December 29, 2018):

> The investment by Gate Worldwide Holdings will support the international expansion of GlobalReach as a U.S. entity (GlobalReach Technology, Inc.) and allow it to capitalize on its success as a market leader in Wi-Fi solutions. Later this year, the company will release a hospitality-focused solution that combines its market leading Hotspot 2.0 capability with centralized PMS authentication to maintain a single user store across multiple venues and brands without adding latency.

> "We chose to invest in GlobalReach, based on its excellent reputation within the global Wi-Fi sector, as well as its market leading platform, which addresses the growing need for custom-fit Wi-Fi products and services," says Ted Helvey, Managing Partner at Gate Worldwide Holdings. "With our support, we believe that GlobalReach will be able to further accelerate its growth and penetration into new global markets and

competitor of Nomadix.

**Gate Brings Suit in New York to Recover on the Note**

27.     On January 3, 2018, Gate brought suit in the Supreme Court of the State of New York, County of New York (the "New York Court"), to collect on the Note in an action against Holdings, Topco, Nomadix, and ST Holdings (the "New York Action").[5]  The Debtors raised certain counterclaims in the New York Action related to Gate (a) improperly interfering with pending litigation brought by Nomadix, (b) refusing to provide reasonable documents requested by the Debtors' potential investors, and (c) executing an invalid assignment of Nomadix' patents, all with the ostensible motive to discourage potential investors from providing financing to the Debtors and to siphon off value to their other business endeavors to the detriment of the Debtors, their other creditors, and the stakeholders of the enterprise.

28.     On June 29, 2018, upon Gate's motion for summary judgment on amounts owed under the Note, judgment was entered in favor of Gate in the amount of $49,658,725.62 against

---

verticals to become the go-to provider for Wi-Fi authentication and management services worldwide." …

Due to its new status as a U.S. Corporation, GlobalReach Technology, Inc. plans to establish new world headquarters in Silicon Valley, California.

[5]     Gate asks this Court to take "judicial notice" of multiple pleadings in the New York Action, seeking to import the docket there into this Court by way of the Clasen Affidavit.  *See* MTD p. 7 n.5. While it is correct that this Court may take judicial notice of the existence of another court's proceedings, *id.*, the Debtors respectfully submit that Gate's reliance as probative evidence on allegations contained in pleadings in New York Action is misplaced.  For example, Gate repeatedly cites to its own allegations in the state court complaint.  *See*, *e.g.*, MTD ¶¶ 18-25.  But the Clasen Affidavit fails to attach the answer to the complaint, so this Court has no way of knowing which allegations in the complaint are in dispute.  Similarly, Gate cites to the Debtors' opposition to the Motion to Confirm for the proposition that the Debtors "baselessly claim[ed] that [Gate] failed to retain a qualified broker on commercially reasonable terms and failed to take commercially reasonable actions in conducting the sale process."  *Id.* ¶ 33. But that opposition was supported by sworn affidavits and the New York Court has not yet ruled on the merits of the opposition. In any event, the reasonableness of the sales process in New York, or lack thereof, is not before this Court, so it is unclear for what ultimate purpose Gate has submitted these various pleadings, particularly as it could have supported its motions by a simple affidavit by one of its principals.

Holdings and Topco (the "<u>Judgment</u>").  No judgment has been entered against ST Holdings LLC. As of the Petition Date, New York Court had not yet ruled on the Debtors' counterclaims which, if successful, would impose liability on Gate for damages caused by Gate's wrongful actions.[6]

29.    Gate, in early July, 2018, served Nomadix and Nomadix's bank with a restraining notice, effectively freezing Nomadix's assets. These restraining notices made it virtually impossible for Nomadix to continue to operate its day-to-day business, not having access to cash to make payroll, to pay healthcare benefits to its employees and their families, or to continue to provide on-going support and maintenance services globally to its millions of daily users, thousands of end-user business licensees, and hundreds of resellers.

30.    On July 17, 2018, Gate requested that it be permitted to start a piecemeal collection on the Judgment, filing a motion to set bidding procedures and scheduling an auction with respect to the equity interests held by Debtor Holdings.  In their response to Gate's request, the Debtors pointed out, among other things, that no meaningful auction could take place so long as the value of Holdings' asset–Nomadix–was drastically being compromised by the very party seeking the forced sale.  The Debtors also requested that any sale order specifically recognize their right under the Uniform Commercial Code to redeem prior to the closing of any sale, given that they had received a binding commitment by Tiller for a transaction they anticipated to close soon.

31.    On August 27, 2018, the New York Court authorized the sale of Holdings' membership interests at a public auction and established certain procedures with respect thereto (the "<u>Sale Order</u>").  It lifted the restraining notice on Nomadix's operating account, subject to Nomadix maintaining therein a certain minimum balance and placing certain funds in a segregated

---

[6]    Gate indicated that, if successful in seizing ownership of the Debtors, it would cause these counterclaims to be dismissed and, with them, any potential reduction of its Judgment.

escrow account.  Equally significantly, the New York Court required that the broker overseeing the auction act in a "commercially reasonable" manner and further provided that objections to the sale could be raised up until the sale hearing, or December 7, 2018.  It also permitted Gate to place an initial credit bid of $10 million.  Finally, the Sale Order reaffirmed the Debtors' right to redemption under the Uniform Commercial Code and to pay off the Judgment prior to the sale being approved by the New York Court.

32.    The auction of Topco's membership interests in Holdings was scheduled to occur on October 15, 2018. However, besides Gate's $10 million credit bid, no other bids were received, the auction was canceled, and the broker designated Gate as the winning bidder.

33.    On October 30, 2018, Gate, in the New York Action, filed a motion to confirm the sale and to transfer all of Holdings' membership interests to it free and clear of all liens, claims, and encumbrances in exchange for a $10 million reduction of the Judgment (the "Motion to Confirm"). The Debtors filed an opposition to the Motion to Confirm, contending that the auction had not been conducted in a commercially reasonable manner and without any effort to maximize the sale price.  Among other things, the Debtors contend, the broker, Traxi LLC, (i) was unlicensed and had no experience relevant to selling the Nomadix and interTouch businesses (i.e., delivering technology-based managed services, software solutions, and hardware solutions to the hospitality industry and other visitor network, including high-speed internet access, digital television, video-on-demand, digital signage, and other in-room entertainment networking solutions); (ii) failed to develop a thorough understanding of the assets it was representing by, for example, failing to interview management or seeking managements' input on how to best position the assets for sale, failing to conduct research of the underlying assets; (iii) failed to engage an investment firm knowledgeable about valuing Nomadix's patent portfolio (or any investment firm at all); and (iv)

failed to set up a data room with relevant information for companies who reasonably would have had an interest in the assets to be sold. In the end, the bid deadline established by Traxi did not provide interested bidders with sufficient opportunity to review essential information regarding the Nomadix and interTouch businesses and analyze their value.

34.    The New York Court held a hearing on the Motion to Confirm on December 7, 2018. At that hearing, the Debtors represented that they expected to obtain the funds to redeem the Judgment by the close of business that day. The New York Court stated that if the redemption did not occur, it would decide the Motion to Confirm and address the Debtors' objections to the Motion to Confirm the following week.

## ARGUMENT

### I.    THE MOTION TO DISMISS THE DEBTORS' CHAPTER 11 CASES MUST BE DENIED BECAUSE NO CAUSE EXISTS TO DISMISS THEM AND THEY SERVE A VALID BANKRUPTCY PURPOSE

#### A)    Legal Standard Governing Motions to Dismiss for Cause

*Section 1112(b)*

35.    Section 1112(b) provides:

> (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* …

11 U.S.C. § 1112(b)(1) (*emphasis* added). Subsection (4) of section 1112(b) provides a non-exhaustive list of circumstances that may constitute cause, all of which implicate *post*-petition conduct. *See In re Bible Speaks*, 65 B.R. 415, 420 (Bankr. D. Mass. 1986) ("The listed causes all seem to be based upon action or inaction on the part of a debtor during the pendency of a case rather than upon the debtor's financial condition at case commencement."). Of these, the only

circumstance invoked by Gate is the alleged "substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  MTD ¶ 69; 11 U.S.C. § 1112(b)(4)(A).

36.      The burden is on the movant to establish "cause" under section 1112(b).  *Nester v. Gateway Access Sols., Inc.* (*In re Gateway Access Sols., Inc.*), 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).  It is not until the movant has met its burden that the burden shifts to the non-movant to prove "unusual circumstances" not warranting mandatory dismissal. *Id.*

***Lack of Good Faith***

37.      Section 1112(b) itself does not impose a good-faith requirement. *Off. Comm. of Unsec. Creditors v. Nucor Corp.* (*In re SGL Carbon Corp.*), 200 F.3d 154, 160 (3d Cir. 1999) ("<u>*SGL Carbon*</u>").  But in 1999, the Third Circuit specifically adopted a "good faith" requirement for chapter 11 petitions on the basis that the list contained in section 1112(b) is not exhaustive. *Id.* at 154.  Consequently, lack of good faith may also constitute "cause" for dismissal.  *Id.* at 160-161.

38.      Whether a petition was filed in good faith is left to the Court in its sound discretion and considering the totality of the circumstances.  *In re S. Canaan Cellular Invs., Inc.*, 2009 Bankr. LEXIS 2967, at *23-4 (Bankr. E.D. Pa. May 19, 2009) ("<u>*Canaan Cellular*</u>").  In exercising their discretion, bankruptcy courts in this Circuit typically consider factors such as the following:

> (a) Single asset case; (b) Few unsecured creditors; (c) No ongoing business or employees; (d) Petition filed on eve of foreclosure; (e) Two party dispute which can be resolved in pending state court action; (f) No cash or income; (g) No pressure from non-moving creditors; (h) Previous bankruptcy petition; (i) Prepetition conduct as improper; (j) No possibility of reorganization; (k) Debtor formed immediately prepetition; (1) Debtor filed solely to create automatic stay; (m) Subjective intent of the debtor.

*Crown Village Farm, LLC v. Arl, LLC (In re Crown Village Farm, LLC)*, 415 B.R. 86, 92 (Bankr. D. Del. 2009) ("*Crown Village*") (quoting *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C.* (*In re Primestone Inv. Partners L.P.*), 272 B.R. 554, 557 (D. Del. 2002)) (the foregoing factors hereinafter are collectively referred to as the "*Primestone* Factors").  "Of course, the existence of one or more such indicia does not compel a finding that the debtor filed its bankruptcy petition in bad faith." *Canaan Cellular*, 2009 Bankr. LEXIS 2967, at *20-21 (Bankr. E.D. Pa. May 19, 2009). Considering "all of the relevant circumstances surrounding the filing," *id.*, the Court decides where the "petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *SGL Carbon*, 200 F.3d at 162.

39.    Against this factual backdrop, the Court considers whether the Debtors' Chapter 11 Cases serve a "valid reorganizational purpose," *Id.* at 164, and whether they were "filed merely to obtain a tactical litigation advantage." *Canaan Cellular*, 2009 Bankr. LEXIS 2967, at *18 (Bankr. E.D. Pa. May 19, 2009) (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, In*c. (*In re Integrated Telecom Express, Inc.*), 384 F.3d 108, 120 (3d Cir. 2004) ("*Integrated Telecom*")).  But the Court's "focus on [these two inquiries] is not intended to limit consideration of other facts and circumstances.  Indeed, no list is exhaustive of all the factors which could be relevant when analyzing a particular debtor's good faith."  *Cross-Appellees in 09-1432 v. BEPCO, LP* (*In re 15375 Mem'l Corp.*), 589 F.3d 605, 618 n.8 (3d Cir. 2009) (internal citations and quotations omitted).

40.    The Debtors' burden to establish good faith is not a heavy one.  *Canaan Cellular*, 2009 Bankr. LEXIS 2967, at *21 (Bankr. E.D. Pa. May 19, 2009) ("a finding of lack of good faith "should not [be] lightly infer[red].'") (citing *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 373 (3d Cir. 2007)).

### B)    Gate Has Failed to Meet Its Burden to Establish "Cause" for Dismissal of the Debtors' Chapter 11 Cases under Section 1112(b)

41.    Gate contends the Chapter 11 Cases must be dismissed for cause because there is a "substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." MTD ¶ 69; 11 U.S.C. § 1112(b)(4)(A). There are two main problems with Gate's contention:  One, the loss or diminution prong is not applicable to debtors that are mere operating companies that hold intangible assets.  *In re 3 Ram, Inc.*, 343 B.R. 113, 117 n.14 (Bankr. E.D. Pa. 2006) ("where the debtor is not an operating company as here but merely holds an intangible asset, the loss or diminution prong of § 1112(b)(4)(A) is not relevant); *DCNC N.C. I, L.L.C. v. Wachovia Bank, N.A.*, 2009 U.S. Dist. LEXIS 93046, at *14-15 (E.D. Pa. Oct. 5, 2009) (where bankruptcy court held loss or diminution prong was not relevant because debtor was not an operating company and only had an intangible asset, appellant could not demonstrate likelihood of success on the merits based on contention that bankruptcy court improperly applied section 1112(b)(4)(A). Two, even though it has the burden of proving cause exists under section 1112(b) to dismiss these cases, Gate freely admits that this conclusory allegation is based on nothing but "scant information" and speculative "potential … damage that may befall" certain subsidiaries of a non-debtor affiliate of the Debtors if Gate does not get its way in the New York Action.  MTD ¶ 69.  Gate also entirely ignores that part of section 1112(b) that requires a showing that dismissal would be "in the best interests of creditors and the estate …" 11 U.S.C. § 1112(b).

42.    To establish cause for dismissal under 1112(b)(4)(A), Gate must show that these Chapter 11 Cases present "visionary or impracticable schemes for resuscitation." *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936).  This it has not done and cannot do.  As is set forth above, below, and in the Moorer Declaration, the Debtors have "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers*

*of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988).  Without conceding that Gate's unfounded allegations operate to shift the burden onto the Debtors, which they do not, the Court can infer from the facts presented by the Debtors that their rehabilitation is plausible and likely: the Debtors have established that, from frequent discussions with Tiller, the Tiller Transaction will close in the near future and they currently also are in discussions with another potential equity partner.  *Cf. Nester v. Gateway Access Sols., Inc.* (*In re Gateway Access Sols., Inc.*), 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007) (under § 1112(b)(4)(A), court "look[s] at the track record of the Debtor to determine if it is suffering losses or making gains … [and] must determine whether rehabilitation is likely given the evidence presented at hearing.")

43.    Gate (only three days after the Petition Date) further contends there is evidence of "substantial and continuing loss to or diminution of the estate" by virtue of administrative expenses "(assuming the Court permits such expenses to be allowed)" that ordinarily accrue during the chapter 11 process.  MTD ¶ 69.  But this, assuming, *arguendo*, the diminution and loss prong applies here, is mere conjecture, and Gate has failed to adduce any evidence—as it must for the Court to determine whether cause for the dismissal exist—for negative cash flow, i.e., that the Debtors are incurring expenses that they will be unable to pay as they become due.  See *Grasso v. Madison Capital Co.*, 2014 U.S. Dist. LEXIS 44113, at *18 (E.D. Pa. Mar. 31, 2014) (stating that the bankruptcy court below "was correct to focus on the cash flow as represented by the difference between receipts and disbursements").  These Chapter 11 Cases are fundamentally distinguishable from those cases courts have dismissed pursuant to section 1112(b)(4)(A) where, months after the order of relief, the continued incurrence of administrative expenses was not justified by the slim prospect of rehabilitating the estate.  *See*, *e.g.*, *id.* (eight months into the case with not "one iota of evidence in support of the availability" of financing for a plan); *In re Johnson*, 2008 Bankr. LEXIS

728, at *14 (Bankr. E.D. Pa. Mar. 11, 2008) (third amended plain likely unconfirmable).

44.   On the issue of rehabilitation, Gate simply concludes that "the Debtors have no prospect of reorganization and no place in bankruptcy court."  *Id*. ¶ 70.  Both conclusions are incorrect.  First, the Debtors' reorganization already is contractually guaranteed by one party, with an additional party having expressed interest.  Second, reorganization is one of the bedrocks of chapter 11, and the Debtors both meet the requirements of section 109(d) (setting forth who may be a chapter 11 debtor).  Gate likewise is incorrect in assuming that the Debtors cannot confirm a plan because "a Chapter 11 plan cannot be confirmed over the dissent" of Gate.  *Id*. ¶ 69.  This assumption rests on the further incorrect assumption that Gate would have a vote on the plan the Debtors intend to propose.  This is not the case because, as is set forth above, the Debtors' restructuring will make available sufficient cash to pay the Judgment owed to Gate in full.

45.   Finally, a dismissal must be "in the best interests of creditors and the estate …" 11 U.S.C. § 1112(b).  The Debtors submit that a dismissal of their cases is in no one's except Gate's self-interest.  This likely is why the best interest analysis is conspicuously absent from Gate's pleadings, even though it is the *sine qua non* of any section 1112(b) inquiry.  *See Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 612 (B.A.P. 9th Cir. 2014) (finding that "bankruptcy court abused its discretion by failing to consider whether conversion or dismissal was in the best interests of all creditors and the estate").  Here, a dismissal would inevitably result in the transfer of Holdings' equity interests in Nomadix and interTouch to Gate.  This result is not in the estates' interest because the estate would lose its most valuable assets for negligible and inadequate consideration.  It is likewise not in the interest of the estates' unsecured creditors, who would receive no recovery whatsoever if the equity interests are transferred to Gate free and clear of their claims.

**C)** **The *Primestone* Factors Do Not Support a Finding that the Debtors'**
**Chapter 11 Cases Lack Good Faith**

46. The application of the *Primestone* Factors provides the context for a determination

that the Debtors filed the Chapter 11 Cases for the legitimate purposes of preserving and

maximizing businesses with assets and maximizing value that would be all but lost outside of

bankruptcy. In the words of the Bankruptcy Appellate Panel of the Ninth Circuit:

> Good faith is lacking only when the debtor's actions are a clear
> abuse of the bankruptcy process. Keeping [Gate] from seizing all
> liquid assets ahead of other creditors … for the benefit of all
> creditors not only do[es] not constitute [an] abuse[] of the
> bankruptcy process, [it] achieve[s] [a] primary goal[] of the
> bankruptcy process.

*Sullivan v. Harnisch* (*In re Sullivan*), 522 B.R. 604, 617 (B.A.P. 9th Cir. 2014).

47. The Debtors may directly hold only a few assets, but that in and of itself is not

indicative of lack of good faith. This Court previously has held that even a chapter 11 case with

only one asset can be filed in good faith. *Crown Village* involved the liquidation of a single real

estate asset held by the debtor. This Court determined that the debtor filed in good faith

notwithstanding the pendency of certain state court actions because it filed to maximize the value

of its one asset through a bankruptcy auction process. *Id*. at 93 ("The overarching reality is that

Debtors had two choices, either abandon its sole asset or seek to maximize the value of its asset

through the bankruptcy process. In choosing the latter, Debtor acted in good faith."); *also see*

*Primestone*, 272 B.R. at 558 ("there is nothing inherently improper in a single asset debtor filing

a Chapter 11 Petition for Reorganization, even shortly before or after a foreclosure proceeding has

commenced"); *Solow v. PPI Enters. (U.S.)* (*In re PPI Enters.(U.S.)*), 324 F.3d 197, 201 (3d Cir.

2003) (affirming denial of this Court's motion to dismiss for an alleged bad faith filing even though

debtor had "no ongoing business, only one remaining employee, and no assets other than stock

certificates representing a 2% interest"). In addition, the Debtors' *interest in* property extends to

its subsidiaries' operations and the Nomadix patent portfolio.

48.     While the Chapter 11 Cases automatically triggered the protections of Bankruptcy Code Section 362, they were not filed solely for that purpose. *See In re Energy Future Holdings Corp.*, 561 B.R. 630, 640 (Bankr. D. Del. 2016) (for courts to make a finding that cases were filed in good faith, "Courts demand *more than* the desire to stay pending litigation with the automatic stay.") (*emphasis* added).   Rather, the imposition of the automatic stay was an acceptable "consequential benefit of an otherwise good faith filing." *In re HBA E., Inc*., 87 B.R. 248, 262 (Bankr. E.D.N.Y. 1988). Prior to the Petition Date, the Debtors were under pressure not just by Gate but from their other creditors as well, and those creditors did not instigate collection actions only because the Debtors assured them they would be paid in due course from the funding secured from Tiller.  When Tiller was unable to timely secure funding, the Debtors were forced to file to obtain the protections of the Bankruptcy Code and to work towards a restructuring, whether it be through a consummation of the Tiller Transaction or through an equity infusion from another party. Since the filing of the Debtors' cases, another party has signed an NDA and been in active discussions with the Debtors concerning an equity transaction commensurate with the Tiller Transaction.  Accordingly, the Debtors' Chapter 11 Cases were not filed solely to benefit from the automatic stay.

49.     Contrary to Gate's assertions, MTD ¶ 66, there is nothing improper about seeking chapter 11 protection on the eve of foreclosure or, as here, on the eve of a company's loss of all of its property. *See*, *e.g*., *Primestone*, 272 B.R. at 558 ("shortly before or after a foreclosure proceeding has commenced").   "Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long-term viability." *SGL Carbon*, 200 F.3d at 164.  This is particularly so when the debtor experienced

significant financial difficulties at the time of the filing.  *Id.*; *In re Bible Speaks*, 65 B.R. 415, 426 (Bankr. D. Mass. 1986) (chapter 11 filing proper where debtor was "facing a cash flow problem which prevents it from meeting its current obligations and a claim which poses a threat to its continued existence").

50.    Here, on the evening of the Petition Date, the Debtors were in a crisis: they had a multi-million-dollar Judgment entered against them but no cash yet to redeem; Gate's request to have Holdings' equity interests transferred to it threatened the Debtors' very existence.  The transfer would effectively have liquidated both Debtors: Holdings would have lost all its property and, Topco, whose only asset is Holdings, likewise.  These cases were filed to gain relief from real debt and to avoid liquidation and with the intent, upon the consummation of the Tiller Transaction, to pay Gate on the Note *in full*.  Otherwise put, like in *In re Energy Future Holdings Corp.*, the Chapter 11 Cases "were not filed for litigation advantage or as a tactical maneuver to evade … liability." 561 B.R. at 645 (finding non-operating entity's chapter 11 filing was in good faith).  Under the circumstances, the timing of the Debtors' chapter 11 petitions is defensible as a sound business judgment.

51.    Gate contends these Chapter 11 Cases arise out of a two-party dispute.  MTD ¶ 63 ("the two-party dispute that is being litigated in the New York Court").  This also is incorrect.  That the New York Action is not a two-party dispute is demonstrated by the simple fact that, should these cases be dismissed and the Debtors' assets extinguished by Gate, the New York Action would nevertheless continue.  Holdings' Obligations under the Note involve parties other than Gate and the Debtors, namely co-defendants and Guarantors ST Holdings and Nomadix, as well as interTouch.  These entities own assets the Debtors do not, and Holdings' liability on account of the Obligations, and the Guarantors' respective proportionate liability, already has given rise to

intercompany claims.  Denying the Debtors the breathing spell to which they are entitled and allowing the New York Action to proceed will force the other defendants in the New York Action into bankruptcy.  Gate already complains about the exorbitant administrative expenses it anticipates the Debtors will incur in connection with these cases.  *Id.* ¶ 69. It takes no expert to establish that putting operating subsidiaries through a chapter 11 process will consume substantially more resources and cause substantially more collateral damage than these Chapter 11 Cases.[7]  This would be so, however, without any proportionally enhanced concomitant benefit: the proposed restructuring of the Debtors for their own, their subsidiaries', and all their creditors' benefit will remain the same.

52.    Finally, it should be noted that the "bad faith" analysis should not focus on the Debtors in a vacuum. Although "many of the 'good faith' cases involve single debtors, rather than a large complex multi-debtor restructuring[,] the Court must consider the Debtors 'holistically' to determine if there is a 'realistic possibility' of rehabilitation of the [debtor entities against whom dismissal is sought]," In *re Energy Future Holdings Corp.,* 561 B.R. 640, 44 (Bankr. D. Del. 2016) (finding no bad faith where debtors filed chapter 11 cases as part of "holistic solution" to maximize assets to satisfy claims). Here, as noted above, both the Tiller Transaction and post-petition interest from another potential equity investor suggest that there is a tangible, realistic possibility of rehabilitating the Debtors.

### D)    The Debtors Chapter 11 Cases Serve Valid Reorganizational Purposes

53.    "Chapter 11 was designed to give those teetering on the verge of a fatal financial

---

[7]    Gate alleges, without proof, that allowing these cases to proceed "has the likelihood of causing material disruption to the business operations of both of InterTouch's operating businesses."  MTD ¶ 64. The Debtors submit that forcing the operating businesses into bankruptcy will be much more disruptive than Gate's wildest speculations, as would be their takeover by a competitor that previously has displayed an utter lack of regard for the Nomadix business, its employees, and customers.

Case 18-12773-BLS    Doc 45    Filed 01/03/19    Page 26 of 47

plummet an opportunity to reorganize on solid ground and try again[.]" *SGL Carbon*, 200 F.3d at 166. In other words, a fresh start. *See Gaglia v. First Fed. Sav. & Loan Ass'n*, 889 F.2d 1304, 1309 (3d Cir. 1989) ("whole point of bankruptcy is to give debtor fresh start") (citing to *In re Folendore*, 862 F.2d 1537, 1540 (11th Cir. 1989)).

54.     The United States Supreme Court has recognized two policies underlying chapter 11 of the Bankruptcy Code– "(i) preserving going concerns and (ii) maximizing property available to satisfy creditors." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 453 (1999). Here, both policies support the Debtors' chapter 11 cases.

i.     The Debtors' Chapter 11 Cases Seek to Preserve a Going Concern

55.     The Chapter 11 Cases are intended to preserve a going concern, and the policies behind chapter 11 support the Debtors' efforts. Gate argues that the Debtors are unable to avail themselves of the "preserving going concern" policy because "the Debtors are not 'going concerns.'" MTD ¶ 54. The Debtors disagree. The Debtors may "have no dedicated employees or business operations[,]" *id.*, but this does not mean their Chapter 11 Cases are not intended to – or are incapable of – preserving a going concern. Even Gate acknowledges that the Debtors have an "operating business." MTD ¶ 64 ("alleging that if the Chapter 11 Cases are allowed to proceed, it has the likelihood of causing material disruption to the business operations of [the Debtor's] operating business").

56.     Gate suggests that a debtor *must be* a going concern to be eligible for the "preservation of going concern" policy and that because neither Debtor is a going concern, they do not qualify. *See* MTD ¶ 54 (arguing that because it "is beyond dispute that the Debtors are not 'going concerns[,]' the only way the Debtors can demonstrate a valid bankruptcy purpose is by "maximiz[ing] the value of the Debtors' estates"). This is incorrect.

57.     Courts engaging in a good faith analysis consistently look at whether there is a going concern the chapter 11 case is seeking to preserve, not whether the debtor *is* a going concern. For example, this Court in *In re Rent-A-Wreck of Am., Inc.* stated: One of the "Third Circuit['s] inquiries [concerning] the question of good faith [is] whether the petition serves a valid bankruptcy purpose, e.g. by preserving a going concern or maximizing the value of the debtor's estate." 580 B.R. 364, 374 (Bankr. D. Del. 2018) (internal quotation omitted).  This quote from the Third Circuit in *Integrated Telecom* that originates from the United States Supreme Court which held that "two recognized policies underlying Chapter 11 [are those] of preserving going concerns and maximizing property available to satisfy creditors."  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 453 (1999) (citing to *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)). Neither the United States Supreme Court, nor the Court of Appeals for the Third Circuit, nor this Court held that the going concern chapter 11 seeks to preserve must be the debtor's own.  If this was the intent, the courts could have easily stated as much (i.e., "by preserving *the debtor's* going concern"), as they did in the second part of the inquiry, which focuses on the *debtor's* estate.  *See also Canaan Cellular*, 2009 Bankr. LEXIS 2967, at *17 (Bankr. E.D. Pa. May 19, 2009) (holding dismissal is appropriate where "the bankruptcy filing merely serves to delay creditors without increasing the value of the estate or preserving *any* going concern"); *In re RainTree Healthcare of Forsyth LLC*, 2018 Bankr. LEXIS 334, at *28 (Bankr. M.D.N.C. Feb. 7, 2018) ("The subjective bad faith inquiry is designed to insure that the petitioner actually intends to use the provisions of Chapter 11 to reorganize or rehabilitate *an* existing enterprise …") (*emphasis* added); *cf. In re Flintkote Co.*, 486 B.R. 99, 131 (Bankr. D. Del. 2012) ("had Congress intended § 524(g) to require a debtor to operate a viable, ongoing, pre-petition business, it would have included statutory language to that effect in § 524(g)(2)(B). However, such a specification is plainly absent").

58.     Finally, the United States Supreme Court has unequivocally rejected the notion that chapter 11 is available only to a debtor that has a going concern when it was called upon to decide whether individual debtors may avail themselves of chapter 11.  It stated in *Toibb*:

> *Finally, we are not persuaded by the contention that Chapter 11 is unavailable to a debtor without an ongoing business because many of the Chapter's provisions do not apply to a nonbusiness debtor.* There is no doubt that Congress intended that a business debtor be among those who might use Chapter 11. Code provisions like the ones authorizing the appointment of an equity security holders' committee, § 1102, and the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management . . .," § 1104(a)(1), certainly are designed to aid in the rehabilitation of a business. It does not follow, however, that a debtor whose affairs do not warrant recourse to these provisions is ineligible for Chapter 11 relief. Instead, *these provisions -- like the references to debtor businesses in the Chapter's legislative history -- reflect an understandable expectation that Chapter 11 would be used primarily by debtors with ongoing businesses; they do not constitute an additional prerequisite for Chapter 11 eligibility beyond those established in § 109(d).*

501 U.S. at 163 (*emphasis* added).

59.     These chapter 11 cases clearly are intended to preserve existing going concerns.  As is discussed above, Holdings holds 100% of the equity of two viable businesses: the Nomadix business and the interTouch business.  Topco, in turn, holds 100% of the equity of Holdings.  Both debtor entities have a single member, Seale A. Moorer, Jr., who also is the sole member of the Debtors' parent, ST Holdings LLC.  The Debtors, through Mr. Moorer, manage and control the Nomadix and interTouch businesses.  They have done so since September 2015, when Holdings purchased both entities from DoCoMo, executed the Note, and caused Topco, Nomadix, and ST Holdings LLC to execute the Guaranties, Pledge Agreements, and Patent Security Agreement, as applicable.  They have continued to do so up until the Petition Date, defending the New York Action and orchestrating the Tiller Transaction.

28

60.     The Debtors have demonstrated that they have existing concerns they seek to preserve; chapter 11 affords the protections that would allow them to do so.  Conversely, a dismissal of the Chapter 11 Cases would seriously jeopardize these going concerns.  Gate already has demonstrated that it is not concerned with preserving Nomadix as a going concern or interested in a continued relationship with Nomadix's several dozen employees in California.  It took the intervention of the New York Court to lift the restraining notice Gate had served on Nomadix's bank to turn off the company's life source.   Gate also drafted an unauthorized assignment document purporting to transfer Nomadix's patents to Gate (in an attempt to conduct an unauthorized strict foreclosure that would violate the Uniform Commercial Code), recorded that document with the Patent and Trademark Office, improperly held itself out as the owner of Nomadix's patents, and engaged in licensing discussions with third parties to the detriment of Nomadix.   Gate's actions have interfered with Nomadix's ability to generate revenue.  For example, in 2016 Nomadix sued a third party for breach of a patent license agreement, seeking to collect unpaid royalties.  Gate's false claims of ownership of the patents and attempt to intervene in the breach-of-contract suit led to a stay of the litigation that has now been pending for nearly nine months.  That case was originally set to go to trial in December 2018; had Gate not improperly claimed ownership of Nomadix's patents, Nomadix could have secured a judgment by now that could generate revenue to pay down the debt.  Instead, Gate has taken steps to delay monetization of these assets, including by aligning its position with the defendant. None of these actions were motivated by a desire to preserve Nomadix's business.  The Debtors' desire to avoid a repeat of Gate's actions and buy Gate out through a restructuring is a valid reorganizational purpose.  The Motion to Dismiss must be denied.

ii.    The Debtors' Chapter 11 Cases Seek to Maximize Property Available to
Satisfy Creditors and Their Equity Security Interests

61.    Even if the Court finds they have no operations to preserve, the Debtors properly

have availed themselves of chapter 11 protection because their cases seek to maximize assets for

their creditors and the value of their equity interests in Nomadix. "[E]ven if a chapter 11 debtor is

not operating and so has no employees, its bankruptcy petition may be in good faith if it is designed

to maximize the value of its assets for creditors and equity security interests." *Canaan Cellular*,

2009 Bankr. LEXIS 2967, at *21 (Bankr. E.D. Pa. May 19, 2009).

62.    To maximize value in the context of chapter 11 means to create and preserve "some

value that otherwise would be lost outside of bankruptcy." *Integrated Telecom*, 384 F.3d at

120 (citing Elizabeth Warren, *Bankruptcy Policymaking in an Imperfect World*, 92 Mich. L. Rev.

336, 350 (1993)). Here, chapter 11 will demonstrably permit the Debtors to create value: without

chapter 11 protection and the opportunity to restructure and refinance, the Debtors' unsecured

creditors would see no recovery and the Debtors' equity interests would be wiped out outside this

Court.

63.    These Chapter 11 Cases were filed to preserve value not available outside of

bankruptcy. This Court previously has recognized that even liquidating debtors can file in good

faith because, "so long as the liquidation plan is maximizing the value of the debtor's estate, it

serves a valid bankruptcy purpose and meets the good faith requirement." *Crown Village,* 415 B.R.

at 92. It is well established that the preservation of assets and enhancement to equity holders'

investments are legitimate purposes for filing for chapter 11 protection. *See*, *e.g*., *PPI Enterprises*

(debtor's sole asset was valuable stock certificate); *Crown Village,* 415 B.R. at 92 (rejecting

argument that, because debtors "are not operating, have no employees, have nominal assets except

for their partnership interests, and have virtually no non-insider held claims" petition was filed

30

without requisite good faith and holding that cases were filed in good faith based on intent to "maximize the value of … assets for creditors *and equity security interests*") (*emphasis* added); *In re Bible Speaks*, 65 B.R. at 426 (enhancement of "return to stockholders" is valid bankruptcy purpose).

## II.    DISMISSAL OF THE CHAPTER 11 CASES PURSUANT TO SECTION 305 OF THE BANKRUPTCY CODE AND ABSTENTION ARE UNWARRANTED

64.    Section 305 of the Bankruptcy Code provides:

> (a) The court. . . may abstain or may suspend all proceedings in a case under this title, at any time *if*
> (1) *the interests of creditors and the debtor would be better served* by such dismissal or suspension

11 U.S.C. § 305(a)(1) (emphasis added).

65.    A "motion under section 305(a) to dismiss a petition or suspend the bankruptcy case is a form of extraordinary relief, and abstention under section 305(a) is a power that should only be utilized under extraordinary circumstances." *Crown Village*, 415 B.R. at 86 (quoting *In re Century/ML Cable Venture*, 294 B.R. 9, 37 (Bankr. S.D.N.Y. 2003)). Gate bears the burden of proving that these Chapter 11 Cases are one of the "rare occasions when both the creditors generally and the debtor itself are better served by dismissal or suspension." 2 *Collier on Bankruptcy* ¶ 302.01[1] (16th ed. 2017); *see also In re AMC Inv'rs, LLC,* 406 B.R. 478, 488 (Bankr. D. Del. 2009); *In re RHTC Liquidating Co.,* 424 B.R. 714 (Bankr. W.D. Pa. 2010) (noting that section 305(a)(1) does not call for a balancing test between the interest of debtors and creditors, and that abstention is generally appropriate only where *both* creditors and debtor would be better served by dismissal).  It has failed to do so.  Its request for abstention or dismissal pursuant to section 305(a)(1) must be denied for the same reasons its request for dismissal under section 1112(b) must be denied and the following.

31

66.    Here, abstention or a dismissal would only benefit Gate.  Other stakeholders, however, would lose the benefit of a restructuring benefitting all stakeholders. Indeed, abstention or dismissal in favor of the New York Action is inimical to the interests of the Debtors and other parties in interest: the Debtors would almost instantaneously lose all of their assets, and Gate would as swiftly proceed to gobble up and shut down the Debtors' creditor subsidiaries (referred to in the MTD as "remaining matters, MTD ¶ 77), without generating any value except for itself. Accordingly, Gate has failed to satisfy its burden of showing that liquidation in the New York Action would benefit the Debtors and the other creditors.

67.    Gate contends that a dismissal is appropriate based on the authority of *In re Fast Food Props., Ltd*. #1, 5 B.R. 539 (Bankr. C.D. Cal. 1980) which allegedly stands for the proposition that "filing bankruptcy solely to avoid state law foreclosure process justifies dismissal under section 305(a)(1)." MTD ¶ 79.  Gate's reliance on *In re Fast Food Props., Ltd*. #1 is misplaced.  First, that case was decided under the Bankruptcy Act.  Second, it did not dismiss a case pursuant to section 305(a)(1),  it dismissed a case pursuant to its "inherent power to dismiss a case which imposed upon its jurisdiction." *Id*. at 540.  The court there merely considered whether section 305 under the Act confined its inherent power to dismiss, which it answered in the negative. Third, the sale provisions that the court found to have been frustrated was contained in a "trust deed"-there was no pending "state law foreclosure process" as Gate suggests.  Given these failed analogies, the Court should disregard *Fast Food*.

68.    Gate's repeated harping on "considerable fees and expenses, including chapter 11 administrative expenses" is a red herring.  *Id*.  Of course, it will cost something to administer these Chapter 11 Cases, and the Debtors fully understand that they will be writing checks to the Office of the United States Trustee in no insignificant amounts.  However, the value achieved though the

proposed chapter 11 restructuring vastly eclipses any expenses attendant to reaching this result. Gate presently proposes to give the Debtors a $10 million credit toward the Judgment in exchange for their equity holdings in their subsidiaries and already holds Nomadix on a short financial leash. By contrast, the Debtors have demonstrated that they have a contractual commitment to obtain a $75 million cash infusion in exchange for these equity interests, $20 million of which are earmarked to an expansion of Nomadix's business.  In light of the in excess of $65 million in value the Debtors intend to generate over the Gate deal, Gate's complaint about fees to be paid in connection with generating such value is laughable.

69.    Finally, the Debtors do not dispute that the New York Court is efficient in what it does but do disagree with Gate's suggestion that the economies of the circumstances presented herein compel the Court to abstain and dismiss in favor of the New York Action.  MTD ¶ 77.  The New York Court's job is to assist with a speedy liquidation in favor of Gate–its specialty is not, like that of this Court, to assist in generating value for all stakeholders.  A dismissal of these Chapter 11 Cases would throw that value out of the window.

## III.    THE STAY RELIEF MOTION MUST BE DENIED BECAUSE NO CAUSE EXISTS TO GRANT STAY RELIEF AND ANY COLLATERAL [AS DEFINED HEREIN] IS NECESSARY FOR AN EFFECTIVE REORGANIZATION

70.    Gate asserts it is entitled to stay relief to seek a transfer of Topco's membership interests in Holdings in the New York Action for cause.  It asserts such cause exists because, for example, its collateral is not adequately protected and that the collateral is not necessary for an effective reorganization.  Gate's position is untenable, however, and the Stay Relief Motion should be denied.

71.    As an initial matter, Gate does not need the relief sought in the Stay Relief Motion. The Stay Relief Motion seeks relief relating to the Sale Order (Ex. G hereto), which is defined in

the SRM as the "Stipulation and Order for the Public Sale of Subject Collateral" or Exhibit 5 to the Clasen Affidavit.[8]  SRM ¶ 26.  Specifically, the Stay Relief Motion requests (i) that the New York Court be permitted to enter the Sale Order and (ii) that Topco's membership interest in Holdings be transferred to Gate in accordance with the Sale Order. SRM ¶¶ 4, 63.[9]  But this makes no sense, and the Stay Relief Motion should be denied on that basis alone.  First, the New York Court *already entered the Sale Order on August 27, 2018*.  *See* supra; SRM ¶ 26. Accordingly, Gate does not need relief from stay for the Sale Order to be entered.  Second, the Sale Order did not provide for a transfer of Topco's membership interest in Holdings to Gate; it provided for a sale of Holdings' membership interest at an auction.  *See* Ex. G; *cf*. SRM ¶ 27 ("Pursuant to the Sale Order, [Gate] placed an opening bid of $10,000,000 for the membership interest units in [Holdings].").  The Stay Relief Motion must be denied.

72.    Further, it is far from clear what "collateral" Gate contends the Debtors' bankruptcy cases allegedly impair. The term is nowhere defined in the Stay Relief Motion; there is mention of a security provided by Topco, SRM ¶ 16, which would suggest that collateral refers to the Pledged Stock, or Topco's equity interests in Holding. In fact, however, Gate's collateral is the Collateral as it is defined in the Financing Documents, which cannot be broken apart and properly allocated between the Issuer, the Guarantors, and the parties having delivered Pledge Agreements.  It is thus disingenuous for the Stay Relief Motion to discuss "adequate protection" and "equity cushion" in a complete vacuum and solely based on a reading of Topco's chapter 11 petition that, of course, does not include "unknown" values of equity or litigation assets in the summary of assets and

---

[8]    The Motions appear to be using the terms Clasen Affidavit and Clausen Affidavit interchangeably. The correct spelling is Clasen.

[9]    Notwithstanding the specific relief requested, the proposed order granting the Stay Relief Motion would have Gate "purchase and acquire interTouch Topco LLC's interest and ownership in interTouch Holdings LLC[.]"

liabilities that the Best Case Bankruptcy software automatically populates. *Id.* ¶ 54.

73.    Finally, Gate has supplied no facts for its baseless claim that the automatic stay here threatens the "immediate deterioration or … complete destruction of Topco's interest in [Holdings.]" SRM ¶ 55. This claim rests on the fallacious suggestion that the Judgment was entered solely against Topco, and that Gate has recourse only against Topco to satisfy the Judgment. *Id.* ¶ 45 ("a good faith estimate of the value of Topco's entire estate … does not exceed the amount of the [Judgment]. … This clearly and unequivocally establishes that there is no equity value in Topco."). This is incorrect. The Judgment was entered against both Debtors jointly and severally and the Obligations are backed by three Guarantors. As is discussed below, not only is Gate adequately protected, it is over protected. The Stay Relief Motion must be denied.

A)    **Purpose of the Automatic Stay**

74.    The automatic stay prohibits the commencement or continuation of any acts affecting the Debtors and/or the property of their respective bankruptcy estates. Section 362 of the Bankruptcy Code provides, in relevant part:

> [A] petition filed under section 301 … of this title … operates as a stay, applicable to all entities, of
>
> (1) the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor *or against property of the estate*, of a judgment obtained before the commencement of the case under this title; …
>
> [and]
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case …

11 U.S.C. § 362(a)(1), (2), and (6) (*emphasis* added); *also see In re Szenes*, 515 B.R. 1, 3-4 (Bankr. E.D.N.Y. 2014); *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1074 (3d Cir. 1992) ("The stay gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits a debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.").

75.    The purpose of the automatic stay is, among other things, "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (citing *Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)).  It also is designed "to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986).

### B)    The Purview the Automatic Stay

76.    Section 362 bars the continuation of actions against the debtor, whether or not those actions implicate property of the estate. *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991). ("Applying § 362(a)(1) to actions against the debtor that do not necessarily involve property of the estate is also consonant with the purposes of the current automatic stay provisions."); see *Sheldon v. Munford, Inc.*, 902 F.2d 7, 8 (7th Cir. 1990) (Posner, J.) (appeal against bankrupt stayed even though judgment ultimately may be paid from non-estate property).

77.    Section 362 also bars the enforcement of pre-petition judgments against the debtor and property of its estate.  11 U.S.C. § 362(a).  The term "property of the estate" is broadly defined

and interpreted.   Section 541 of the Bankruptcy Code provides, in relevant part, that "[t]he commencement of a case under section 301 … creates an estate. Such estate is comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case."   11 U.S.C. § 541(a)(1).   Courts construe the term equally broadly.   The Bankruptcy Court for the Eastern District of New York in *In re S. Side House, LLC*, summarized the concept as follows:

> Courts define property of the estate broadly. When a debtor has an interest in property under state law, Section 541(a) determines if that interest is sufficient to bring the property into the estate. *See, e.g.*, *In re Koula Enters., Ltd.*, 197 B.R. 753, 757 (Bankr. E.D.N.Y. 1996) (citing *In re Prudential Lines Inc.*, 928 F.2d 565, 569 (2d Cir. 1991)). As explained by the Second Circuit, property of the estate includes "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (internal quotation marks omitted). *See Brown v. Dellinger* (*In re Brown*), 734 F.2d 119, 123 (2d Cir. 1984) (stating that "all legal and equitable interests of the debtor in property has been given the broadest possible interpretation").

*In re S. Side House, LLC*, 474 B.R. 391, 402 (Bankr. E.D.N.Y. 2012).   This also is good law in the Third Circuit.   *See, e.g.*, *In re Trump Entm't Resorts, Inc.*, 534 B.R. 93, 99 (Bankr. D. Del. 2015) ("The scope of the automatic stay is undeniably broad.") (citing *Cuffee v. Atlantic Bus. & Cmty. Dev. Corp.* (*In re Atlantic Bus. & Cmty. Dev. Corp.*), 901 F.2d 325, 327 (3d Cir. 1990)); *id.* at 102 ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. Courts have construed property of the estate to include both tangible and intangible property, including rights arising out of ordinary contractual relationships, and have even gone so far as to find that the expectation of continuity of business relationships qualifies as property of the estate.") (internal citation and quotation omitted).

78.   Sometimes, the automatic stay also applies to a wholly-owned subsidiary of the debtor on the basis that there is such substantial overlap in the identity of the debtor and the

subsidiary, "that the debtor may be said to be the real party defendant." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003) (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)).   The court in *Queenie*, for example, held that the stay also applied to the debtor's wholly-owned subsidiary because the "adjudication of a claim against the [subsidiary] will have an immediate adverse economic impact on [the debtor.]" *Id.*

> This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

79.     Under certain circumstances, the stay also may be extended to actions against non-debtors pursuant to 11 U.S.C. § 105, which grants the Court the power to issue orders necessary or appropriate to carry out the provisions of title 11.  This Court stated in *In re Cont'l Airlines*:

> Consistent with congressional intent and with the fundamental purposes underlying the automatic stay, numerous federal courts have held that, under appropriate circumstances, the automatic stay may be extended beyond direct actions against the debtor to lawsuits against non-debtors. Specifically, courts in this circuit and others have held that  while the automatic stay ordinarily applies only to actions against the debtor itself, it is properly extended to actions against non-debtors where an identity of interest exists between the debtor and non-debtor defendant such that the debtor is the real party defendant and the litigation will directly affect the debtor and, more particularly, the debtor's assets or its ability to pursue a successful plan of reorganization under Chapter 11.

177 B.R. 475, 479 (D. Del. 1993).  *Also see Covertech Fabricating, Inc. v. TVM Bldg. Prods.*, 2017 U.S. Dist. LEXIS 186933, at *14 n.4 (W.D. Pa. Nov. 13, 2017) (jurisdiction of bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include

suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate … and to those suits which may affect the allocation of property among creditors) (internal quotations from *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) and *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161-62 (7th Cir. 1994) omitted).  In these circumstances, "the court will have to determine whether a particular action which may be harming the estate should be stayed." *In re Norwesco Dev. Corp.*, 68 B.R. 123, 126 (Bankr. W.D. Pa. 1986).

### C)    Legal Standard for Relief from the Automatic Stay

72.    Section 362(d) provides for relief from the automatic stay under certain limited circumstances.  It states, in relevant part:

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
> (1)  for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2)  with respect to a stay of an act against property under subsection (a) of this section, if--
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization; …

11 U.S.C. § 362(d)(1)-(2).

73.    "Cause" as used in section 362(d)(1) is undefined and courts determine whether cause exists on a case-by-case basis. *See In re DBSI, Inc.*, 407 B.R. 159 (Bankr. D. Del. 2009). To determine whether cause exists to lift the stay and allow a creditor to deprive the estate of an interest in property, courts "generally consider the policies underlying the automatic stay" and "the competing interests of the debtor and the [m]ovant." *In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993). Additionally, "in balancing the competing interests of the debtor and the movant, Courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2)

the balance of the hardships facing the parties; and (3) the probable success on the merits if the stay is lifted." *Id*. at 31.

74.     Gate has the burden of establishing cause for relief from the automatic stay by demonstrating that the relative balancing of hardships between Gate and the Debtors weigh significantly in favor of Gate. *See In re RNI Wind Down Corp*., 348 B.R. 286, 299 (Bankr. D. Del. 2006) ("In order to establish cause for relief under section 362(d)(1), the party seeking relief from the stay must show that the balance of hardships from not obtaining relief tips significantly in its favor") (citations and internal quotation marks omitted). Further, "[i]f the movant fails to make an initial showing of cause," then "the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax Indus., Inc. v. Tri Component Prods. Corp*. (*In re Sonnax Indus., Inc*.), 907 F.2d 1280, 1285 (2d Cir. 1990). Without compelling evidence that the relative hardships weigh in the movant's favor, courts deny the request for relief from the automatic stay. *See In re W.R. Grace & Co*., 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (denying lift stay motion after movant "presented no compelling evidence that the balance of hardships was in its favor").

75.     Gate also has the burden of proving lack of equity.  *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304 (Bankr. D. Del. 2011("The movant has the burden of proving lack of equity and a prima facie case for cause; the debtor has the burden of proving adequate protection and the feasibility of a reorganization.").

### D)     Cause for Lifting the Automatic Stay Does Not Exist Because the Chapter 11 Petitions Were Filed in Good Faith

76.     The Debtors hereby incorporate their above discussion of why these Chapter 11 Cases were filed in good faith.  No cause exists to grant the Stay Relief Motion on the basis that they were not filed in good faith.

### E)    Cause for Lifting the Automatic Stay Does Not Exist Because Gate Is Adequately Protected

77.    Gate asserts it is entitled to stay relief because there is no equity cushion sufficient to absorb continued interest accrual. SRM ¶ 53.  Consequently, according to Gate, it lacks adequate protection.  *Id*.  The Court should reject Gate's reasoning.

78.    First, there is a sufficient equity cushion to adequately absorb interest accumulating on the Judgment.  In determining whether there is an equity cushion, the Court looks at "the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims."  *Nantucket Inv'rs II v. Cal. Fed. Bank* (*In re Indian Palms Assocs.*), 61 F.3d 197, 207 (3d Cir. 1995). Gate contends that the value of the property=Topco's equity interest in Holdings and claim=Judgment, and concludes that the equity cushion=zero.  SRM ¶¶ 54-5. However, this calculation is disingenuous.  For one, it is based entirely on a willfully narrow reading of Topco's petition: as anyone who has used Best Case Bankruptcy to populate a petition knows, "unknown" or "undetermined" amounts do not appear on a petition and are not included in the calculation of available assets in the summary of assets and liabilities.  (Besides, if Gate wants to conduct the equity cushion equation based solely on what is contained on Topco's petition, then it cannot claim the Judgment as a liability-because the Judgment does not appear on the petition.)  Further, as Gate knows quite well, Holdings is Topco's only asset, so the value of Topco directly correlates with the value of Holdings and that of Holdings' two subsidiaries, Nomadix and interTouch.  Otherwise put, Gate knows Topco's equity is not zero, and the collateral for its Judgment is *the* Collateral, as defined above.

79.    In fact, the combined value of the key assets presently held by Nomadix and interTouch is approximately $77.9 million, not counting the value that can be ascribed to Nomadix's patent portfolio. Gate's Collateral, therefore, includes the assets and revenue of two

41

going concerns with cash, accounts receivable, inventory, and working fixed assets. In addition, Nomadix and interTouch have $2.5 million and $26.7 million, respectively, in contracted recurring revenues, adding up to an aggregate value of the assets backing the Collateral of over $100 million-again without ascribing **any** value to the Nomadix patents. *See* Moorer Declaration. While the foregoing are not property of the estate, the Debtors, as 100% parents, hold an interest in that property. Gate's argument that it will be left without recourse should Topco not "service its debt" is insincere.

80.    Gate argues that "Topco has not provided or offered *any* form of adequate protection to [Gate] from the immediate deterioration or threat of the complete destruction of Topco's interest in [Holdings] caused by the imposition of the automatic stay …, [Gate] is entitled to relief from the stay under section 362(d)(1)." *Id.* ¶ 55 (*emphasis* in original). It provides not a scintilla of evidence of any such destruction or, as it calls it by reference to section 362(f), "irreparable damage" of Topco's equity interests in Holdings. Nor could it. How does the stay permanently damage these interests or cause them to drop in value? Surely that would be not in Topco' nor Holdings', nor in their ultimate parent ST Holdings' interest.

81.    Gate could have presented more substance to meet its burden that Topco lacks equity in its membership interests in Holdings, but it made the tactical decision not to and, as a consequence, has failed to establish cause based on lack of adequate protection. This Court should not reward Gate's underhanded tactics and deny the Stay Relief Motion.

    F)    **The Stay Relief Motion Should Be Denied Because Topco Has an Equity Interest in Its Ownership Interest in Holdings, Holdings has a Corresponding Interest in Nomadix and interTouch, and this Collateral Is Necessary for an Effective Reorganization**

82.    As is set forth above and in the Moorer Declaration, Topco does have equity in its interest in Holdings and the collateral/Collateral is necessary to an effective reorganization. Stay

relief therefore is not appropriate at this time.

### G)    The Balancing of the Harm Tips in the Debtors' Favor

83.    Gate has not articulated how-or that-it would be harmed if the stay were not lifted. The Debtors' however, would be severely prejudiced should the Stay Relief Motion be granted. Should the equity interests held by Holdings be transferred to Gate, the Debtors will not be able to complete the Tiller Investment or any alternative investment or to conduct a sale of their properties in a commercially reasonable fashion, all of which would severely prejudice the estates, the estates' creditors, the equity holders and the very purpose for which Chapter 11 exists.  As set forth above, the Debtors are keenly focused on consummating the Tiller Transaction and negotiating an alternate equity transaction and should be allowed to do so unless it becomes apparent that such alternatives are unlikely to be achieved.  Granting Gate stay relief to proceed with the New York Action will impair the Debtors' ability to accomplish these goals.  The Stay Relief Motion must be denied.

### IV.    GATE'S DEMAND FOR ADDITIONAL ADEQUATE PROTECTION SHOULD BE DENIED BECAUSE IT HAS FAILED TO PROVE THAT THE VALUE OF THE COLLATERAL IS DECLINING AND ALREADY IS ADEQUATELY PROTECTED BY THE AWARD OF POST-JUDGMENT INTEREST BY THE NEW YORK COURT

84.    The New York Court awarded Gate post-Judgment interest at the rate of 9%.  In addition, all accrued by unpaid pre-judgment interest is also accounted for because the value of the Collateral by far exceeds the amount of the Judgment.  As is discussed below, post-judgment interest serves to compensate a judgment creditor such as Gate for the time during which it is deprived of the use of its money.  Additionally, Gate has failed to meet its burden to show that the value of the Collateral is declining.  *In re Cont'l Airlines*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("courts have uniformly required a movant seeking adequate protection to show a decline in value

of its collateral"). Therefore, Gate already is adequately protected and this Court should not award it any additional adequate protection.

85.    The purpose of adequate protection is to protect the value of a creditor's prepetition interest in property.  *Resolution Tr. Corp. v. Swedeland Dev. Grp.* (*In re Swedeland Dev. Grp.*), 16 F.3d 552, 564 (3d Cir. 1994) ("the whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy") (citing *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)).  A creditor's request for adequate protection therefore often arises out of a prepetition lender's concern that will suffer a loss by a superpriority given to a post-petition loan; *id.*; or a lenders' concern that the debtors-in-possession is unable to service existing loans.  *See*, *e.g.*, *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. at 296 (debtors' loans were "held by a collateralized debt obligation managed and serviced by an affiliate").  Here, none of the concerns that typically are addressed by a debtor providing adequate protection exist.

86.    First, Gate is not a prepetition lender.  Gate purchased a defaulted Note at a discount, then sued the Debtors, and now demands adequate protection as a judgment creditor.  As is further discussed below, the interests of a judgment creditor are adequately protected by an award of post-judgment interest.  Second, there currently is no priming loan pending that could impede Gate's interest, and none is contemplated.  Third, the Note is in default and Gate is a judgment creditor-by implication, the Debtors' debt service obligations under the Note have been extinguished.  Fourth, Gate cannot prove that the value of the Collateral is declining. Fifth, considering the value of the Collateral, Gate clearly is overprotected already.  For all the foregoing reasons, Gate is not entitled to any additional adequate protection.

87.    The interest the New York Court awarded Gate on the Judgment amount adequately

protects Gate from any decline in value of the Judgment. The United States Supreme Court once stated that "[i]nterest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention[.]" *Brown v. Hiatts*, 82 U.S. 177, 185 (1872); *Universal City Studios, Inc. v. Francis I. Du Pont & Co.*, 334 A.2d 216, 222 (Del. 1975) ("The rule was correctly relied on below that the purpose of interest is to fairly compensate plaintiffs for their inability to use the money during the period in question.") (citing to *Felder v. Anderson, Clayton & Co.*, 159 A.2d 278 (1960)).

88.     While courts typically discuss this principle of preserving the true value of a judgment in connection with awarding pre-judgment interest, it is clear that the same principle applies with respect to post-judgment interest. *See*, *e.g.*, *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) ("the purpose of post[-]judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant") (citing *Poleto v. Conrail Corp.*, 826 F.2d 1270, 1280 (3d Cir. 1987)); *Brandin v. Gottlieb*, C.A. No. 14819, 2000 Del. Ch. LEXIS 97, at \*101-02 (Ch. July 13, 2000) (noting that "[w]ithout an award of post-judgment interest on the … final judgment, [the judgment debtor] could chip away at the real value of [the judgment creditor's] recovery and diminish his obligation to her."). The New Jersey Superior Court, Appellate Division, summarized the "make whole" principle behind an award of interest as follows:

> Pre-judgment interest is in contemplation of law "damages" for the illegal detention of a legitimate claim or indebtedness. *See Rova Farms Resort v. Investors Ins. Co.*, 65 N.J. 474, 506, 323 A.2d 495 (1974). It therefore serves to "indemnify the claimant for the loss of what the monies due him would presumably have earned if payment had not been delayed." *Busik v. Levine*, 63 N.J. 351, 358, 307 A.2d 571 (1973), app. dism. 414 U.S. 1106, 94 S. Ct. 831, 38 L. Ed. 2d 733 (1973); *Fasolo v. Div. of Pensions*, *supra*, 190 N.J. Super. at

> 584, 464 A.2d 1180 (1983). Post-judgment interest is based on the same rationale, enhanced, however, by the dimension of an adjudication of improper withholding.

*N.J. Dep't of Labor v. Pepsi-Cola Co.*, 765 A.2d 760, 763 (N.J. Super. Ct. App. Div. 2001). Courts across the United States "have echoed this principle." Miller at 609 and n.32 (citing cases); *see*, *e.g.*, *Booker v. Taylor Milk Co.*, 64 F.3d 860, 869 (3d Cir. 1995) (denying request for prejudgment interest finding that "the award of back pay *alone* wholly compensated Plaintiff") (*emphasis* in original); *Smith v. Int'l Total Servs.*, 1997 U.S. Dist. LEXIS 16236, at *36 (E.D. Pa. Oct. 9, 1997) ("To fulfill this 'make-whole' purpose, pre[-]judgement interest is to be given in response to considerations of fairness and denied when its exaction would be inequitable.") (internal quotations omitted).

89.    Because Gate was awarded post-judgment interest on the entire amount of the Judgment (not just that portion ultimately allocable to Topco), Gate's interest in the Topco membership interests already is adequately protected. The value of the Collateral by far exceeds the Judgment, and Gate is an oversecured creditor. The Court should decline to award Gate any additional funds above and beyond to those to which the New York Court found it was entitled and contrary to established precedent in this Court. However, to the extent the Court is inclined to do so, the Debtors respectfully request that it limits additional adequate protection to "such other relief … as will result in the realization by [Gate] of the indubitable equivalent of such entity's interest in [the Collateral]." 11 U.S.C. § 361(3).

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the

Court (i) deny the Motion to Dismiss, (ii) deny the Stay Relief Motion, (iii) deny the Adequate

Protection Demand, and (iv) grant such other and further relief as is just and proper.


Dated: January 3, 2018
       Wilmington, Delaware               KLEIN LLC

                                          */s/ Julia B. Klein*
                                          Julia B. Klein (Bar No. 5198)
                                          919 North Market Street
                                          Suite 600
                                          Wilmington, Delaware 19801
                                          Phone: (302) 438-0456
                                          Fax: (302) 300-1733

                                          *Proposed Counsel to the Debtors*
                                          *and Debtors in Possession*