IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>interTouch Topco LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12773 (BLS)<br><br>Jointly Administered |

**DECLARATION OF SEALE A. MOORER, JR., IN SUPPORT OF OMNIBUS OBJECTION BY DEBTORS TO GATE WORLDWIDE HOLDINGS LLC'S (I) EMERGENCY MOTION TO DISMISS THE DEBTORS' CHAPTER 11 CASES PURSUANT TO § 1112(b) AND/OR ABSTAIN FOR [*SIC*] HEARING DEBTORS' CHAPTER 11 CASES PURSUANT TO § 305(a) OF THE BANKRUPTCY CODE; AND (II) EMERGENCY MOTION FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTIONS 362(d) AND (f) OF THE BANKRUPTCY CODE**

I, Seale A. Moorer, Jr., hereby declare as follows:

1. I am the chief executive officer of interTouch Holdings LLC ("Holdings") and interTouch Topco LLC ("Topco"), the above-captioned debtors and debtors-in-possession (together, the "Debtors"). I have served as managing member of the Debtors since 2015 and am generally familiar with the day-to-day operations of the Debtors and their affairs, books, and records.

2. I make this declaration in support of the Debtors' omnibus objection (the "Objection") to the motions by Gate Worldwide Holdings LLC ("Gate") (a) to dismiss their Chapter 11 Cases [D.I. 4; filed 12/13/18] (the "Motion to Dismiss") and (b) for stay relief [D.I. 5; filed 12/13/18] (the "Stay Relief Motion"). I have reviewed the Motion to Dismiss and the Stay Relief Motion and have personal knowledge of the facts alleged therein. I also have had the

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: interTouch Holdings LLC (2091) and interTouch Topco LLC (6381). The Debtors' headquarters is located at 480 Olde Worthington Road, Suite 350, Westville, OH 43082.

opportunity to discuss both motions and the relief they seek with counsel and other professional advisors. Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Objection.

3. As managing member, I am responsible for the management of the Debtors' operations, overseeing the Debtors' liquidity management, and assisting with the Debtors' refinancing efforts. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied by members of the Debtors' management and the Debtors' other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

**The Nature of the Debtors' Business Operations**

4. Topco and Holdings both are limited liability companies that were formed in 2015 under the laws of the State of Delaware for the purpose of acquiring two existing operating businesses. Topco is Holdings' 100% parent and a wholly-owned subsidiary of non-debtor ST Holdings LLC. The businesses they were formed to acquire are Nomadix, Inc. ("Nomadix"), a Delaware corporation with a principal place of business in Agoura Hills, California, and interTouch Pte. Ltd., a Singapore company, and its subsidiaries (collectively, "interTouch").

5. Nomadix is a profitable company that, for over twenty years, has engaged in the manufacture and sale of gateway devices and licensing of software solutions that facilitate internet access for mobile users at public locations and are used extensively in the hospitality and other visitor-based industries. Nomadix has approximately three dozen employees and a handful of contractors. It sells its product globally through a sales channel that numbers over 600 authorized distributors and resellers. Nomadix currently has well over 10,000 active licensed units globally,

including businesses such as hotels, convention centers, schools, hospitals, airports, stadiums, retail stores, office businesses, multi-dwelling units, and the like, that depend on Nomadix's ongoing daily service, support, and software maintenance to help support and maintain their internet service. Nomadix' stream of income is derived chiefly these products and from its largest asset, a substantial patent portfolio developed over many years and including patents that are seminal to the provision of internet service in public places.

6.      interTouch is one of the leading global providers of technology-based services and solutions to the hospitality industry in Asia-Pacific, Australia, Middle-East, Africa, and Central and Latin America. interTouch's solutions include wired and wireless high-speed internet access, digital television, video-on-demand, digital signage, and other in-room entertainment and networking solutions to guestrooms, conference facilities, and other common areas. interTouch provides services to over 1,000 hotel properties. interTouch is headquartered in Singapore and operates in over 46 countries. Its customers include some of the top hospitality brands in the world.

7.      interTouch and Nomadix are fully vertically integrated and function as a team: Nomadix is an important software engine, and interTouch provides the rest of the solutions on top of that engine. Both companies work hand in hand to produce optimal value.

**The Value of Key Assets of interTouch and Nomadix**

8.      In preparation for this Declaration, I reviewed the current balance sheets for both interTouch and Nomadix, the contracted backlog of new sales, the contracted recurring revenue, the current sales activities, the pending patent license fee litigation with Guest-Tek, the FTI patent models and documents related to the patents provided by our management team and counsel. Based on my review of the foregoing documents, the combined value of the key assets presently

3

held by Nomadix and interTouch, such as cash on hand, inventory, fixed assets, license fees, and work in progress, is approximately $77.9 million. This amount excludes the value that can be ascribed to Nomadix's patent portfolio. In addition, Nomadix and interTouch have $2.5 million and $26.7 million, respectively, in contracted recurring revenues, adding up to an aggregate value of the assets backing the Collateral of over $100 million-again without ascribing any value to the Nomadix patents. I am informed that the foregoing assets are not technically considered assets of the Debtors' bankruptcy estates. But the Holdings and Topco, because they hold one hundred percent of Nomadix's and interTouch's equity interests, directly and indirectly, respectively, have an interest in the property held by their subsidiaries.

9. The Debtors' proposed counsel has explained to me the concepts of "adequate protection" and "equity cushion" in the bankruptcy context and I understand that an equity cushion is the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims. Based on my review of the aforementioned financial documents of Nomadix and interTouch, it is my opinion that the value of the Collateral (not including amounts attributable to Nomadix's patent portfolio) after deducting Gate's claim is approximately $50 million, and that there is a sufficient equity cushion to adequately absorb all interest accumulating on the Judgment.

**Pre-petition, the Debtors Hired FTI Consulting to Develop a Model for Determining Nomadix's Royalty Stream and Cash Flow Projections**

10. Beginning in mid-2016, the Debtors engaged the services of FTI Consulting to validate their view of the value of the intellectual property held by their wholly-owned subsidiary Nomadix that had been pledged to DoCoMo as security for the Note. Specifically, FTI Consulting was engaged to review the patent royalty history and data to aid Nomadix's management team in

determining the potential royalty stream and making cash-flow projections, based on a number of assumptions, related to certain portions of the Nomadix's patent portfolio.

11. After six months of an extensive amount of research and dialogue with Nomadix and Nomadix's outside intellectual property legal team, FTI Consulting completed their evaluation of the data and provided Nomadix, Inc. with its finding in January, 2017 (the "FTI Model"). The FTI Model confirmed that the value of Nomadix's patent portfolio by far exceeds the Debtors' Obligations under the Note. The FTI Model, by enabling the Debtors to make informed revenue and cash flow projections, could support future efforts to secure a successful financing transaction.

**The Debtors Enter into a Binding Equity Transaction with Tiller**

12. In February 2018, I was introduced to the Tiller International Capital LLC ("Tiller"). I met with Mr. Georgiou, its founder, a few times in February and, on March 2, Tiller signed a Nondisclosure Agreement. Tiller subsequently performed due diligence in connection with exploring investment opportunities in Holdings. Following several additional meetings and further discussions, I, through ST Holdings LLC (Holdings' and Topco's parent company), secured a binding commitment from Tiller to finance the Debtors, which was memorialized in a binding Memorandum of Understanding dated as of May 22, 2018 (the "MOU"). The MOU obligated Tiller to make two capital contributions in the respective amounts of $55 million and $20 million and contemplated, among other things, the creation of two new joint ventures as well as a corporate restructuring of the ST Holdings subsidiaries for the purpose of expanding the business of Topco and its direct and indirect subsidiaries both domestically and internationally (collectively, the "Tiller Transaction"). The cash derived from the Tiller Transaction was intended to eliminate Holdings' Obligations under the Note, eliminate the need to pay for debt service, and to fund an expansion of existing business and profitability overall. I personally negotiated the MOU and all other documents

executed in connection with the Tiller Transaction and have personal knowledge of the terms set forth therein.

13. In preparation for the Tiller Transaction, I caused two new joint venture entities to be formed on March 30; those joint venture companies then adopted bylaws in June. Shareholder agreements and certain Subscription and Asset Contribution Agreements to complete and consummate the Tiller Transaction were executed on June 17, 2019. On that day, all conditions to funding were satisfied.

14. It had been anticipated Tiller would fund the transactions no later than Friday, December 7, 2018. The source of Tiller's investment was to be a loan secured by certain assets of Tiller. The assets serving as collateral were required to be appraised, and unfortunately, the appraisal process was not completed by this deadline.

**These Chapter 11 Cases Were Filed with the Intent to Restructure the Debtors' Existing Business Structure, Pay off Gate, and Preserve and Expand the Going Concerns of the Debtors' Subsidiaries**

15. Here, on the evening of the Petition Date, the Debtors were in a crisis: they had a multi-million-dollar Judgment entered against them but no cash yet to redeem; Gate's request to have Holdings' equity interests transferred to it threatened the Debtors' very existence. The transfer would effectively have liquidated both Debtors: Holdings would have lost all its property and, Topco, whose only asset is Holdings, likewise. These cases were filed to gain relief from real debt and to avoid liquidation and with the intent, upon the consummation of the Tiller Transaction, to pay Gate on the Note *in full*.

16. The Chapter 11 Cases are intended to preserve a going concern. The Debtors have no dedicated employees or business operations, but Holdings holds 100% of the equity of two viable businesses: the Nomadix business and the interTouch business. Topco, in turn, holds 100%

of the equity of Holdings. Both debtor entities have a single member, myself, who also is the sole member of the Debtors' parent, ST Holdings LLC. The Debtors manage and control the Nomadix and interTouch businesses. They have done so since September 2015, when Holdings purchased both entities from DoCoMo, executed the Note, and caused Topco, Nomadix, and ST Holdings LLC to execute the Guaranties, Pledge Agreements, and Patent Security Agreement, as applicable. They have continued to do so up until the Petition Date, defending the New York Action and orchestrating the Tiller Transaction. The Debtor believe that there is a reasonable possibility of a successful reorganization within a reasonable time.

17.     It is my belief, based upon the information available to me and based on prior course of dealing with Gate, that a dismissal of the Chapter 11 Cases would seriously jeopardize the Nomadix and interTouch going concerns. Gate already has demonstrated that it is not concerned with preserving Nomadix as a going concern or interested in a continued relationship with Nomadix's several dozen employees in California. It took the intervention of the New York Court to lift the restraining notice Gate had served on Nomadix's bank to turn off the company's life source. Gate also drafted an unauthorized assignment document purporting to transfer Nomadix's patents to Gate (in an attempt to conduct an unauthorized strict foreclosure that would violate the Uniform Commercial Code), recorded that document with the Patent and Trademark Office, improperly held itself out as the owner of Nomadix's patents, and engaged in licensing discussions with third parties to the detriment of Nomadix. Gate's actions have interfered with Nomadix's ability to generate revenue. For example, in 2016 Nomadix sued a third party for breach of a patent license agreement, seeking to collect unpaid royalties. Gate's false claims of ownership of the patents and attempt to intervene in the breach-of-contract suit led to a stay of the litigation that has now been pending for nearly nine months. That case was originally set to go to trial in December

2018; had Gate not improperly claimed ownership of Nomadix's patents, Nomadix could have secured a judgment by now that could generate revenue to pay down the debt. Instead, Gate has taken steps to delay monetization of these assets, including by aligning its position with the defendant. It is clear that none of these actions were motivated by a desire to preserve Nomadix's business.

Pursuant to 11 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January ___, 2019.

_____
Seale A. Moorer, Jr.
Chief Executive Officer
interTouch Holdings LLC